# BATEMAN EICHLER, HILL RICHARDS, INC. *v.* BERNER ET AL.

No. 84–679.   Argued April 15, 1985—Decided June 11, 1985

300

BRENNAN, J., delivered the opinion of the Court, in which WHITE, BLACKMUN, POWELL, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined. BURGER, C. J., concurred in the judgment. MARSHALL, J., took no part in the decision of the case.

*Robert S. Warren* argued the cause for petitioner. With him on the briefs were *Phillip L. Bosl* and *Gail Ellen Lees.*

*Geoffrey P. Knudsen* argued the cause for respondents Berner et al. With him on the brief was *John H. Boone.*

*Bruce N. Kuhlik* argued the cause *pro hac vice* for the Securities and Exchange Commission as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Lee, Deputy Solicitor General Claiborne, Daniel L. Goelzer, Paul Gonson, Jacob H. Stillman,* and *Larry R. Lavoie.**

---

**Edward H. Fleischman, Martin P. Unger, Catherine A. Ludden,* and *William J. Fitzpatrick* filed a brief for the Securities Industry Association as *amicus curiae* urging reversal.

JUSTICE BRENNAN delivered the opinion of the Court.

The question presented by this case is whether the common-law *in pari delicto* defense bars a private damages action under the federal securities laws against corporate insiders and broker-dealers who fraudulently induce investors to purchase securities by misrepresenting that they are conveying material nonpublic information about the issuer.

## I

The respondent investors filed this action in the United States District Court for the Northern District of California, alleging that they incurred substantial trading losses as a result of a conspiracy between Charles Lazzaro, a registered securities broker employed by the petitioner Bateman Eichler, Hill Richards, Inc. (Bateman Eichler), and Leslie Neadeau, President of T. O. N. M. Oil & Gas Exploration Corporation (TONM), to induce them to purchase large quantities of TONM over-the-counter stock by divulging false and materially incomplete information about the company on the pretext that it was accurate inside information.[1] Specifically, Lazzaro is alleged to have told the respondents that he personally knew TONM insiders and had learned, *inter alia*, that (a) "[v]ast amounts of gold had been discovered in Surinam, and TONM had options on thousands of acres in gold-

---

[1] The investors named Lazzaro, Neadeau, TONM, and Bateman Eichler as defendants. Complaint ¶¶ 5–8, App. 7–8. The investors charged that Neadeau and TONM had "directly and indirectly participated with, aided and abetted, and conspired with" Lazzaro in the scheme. *Id.* ¶ 9, App. 8; see also *id.* ¶ 40, App. 17. Bateman Eichler's liability was premised on its status as a "controlling person" of Lazzaro within the meaning of § 20(a) of the Securities Exchange Act of 1934, 48 Stat. 899, 15 U. S. C. § 78t(a). Complaint ¶¶ 5, 39, App. 7, 16–17. See n. 25, *infra.*

Although Lazzaro, Neadeau, and TONM also are respondents in this Court, see this Court's Rule 19.6, we shall use "respondents" to refer exclusively to the investor plaintiffs, who are defending the judgment of the Court of Appeals for the Ninth Circuit in this Court.

producing regions of Surinam";[2] (b) the discovery was "not publically known, but would subsequently be announced"; (c) TONM was currently engaged in negotiations with other companies to form a joint venture for mining the Surinamese gold; and (d) when this information was made public, "TONM stock, which was then selling from $1.50 to $3.00/share, would increase in value from $10 to $15/share within a short period of time, and . . . might increase to $100/share" within a year. Complaint ¶¶ 16–17, App. 10–12.[3] Some of the respondents aver that they contacted Neadeau and inquired whether Lazzaro's tips were accurate; Neadeau stated that the information was "not public knowledge" and "would neither confirm nor deny those claims," but allegedly advised that "Lazzaro was a very trustworthy and a good man." *Id.* ¶ 19, App. 12.

The respondents admitted in their complaint that they purchased TONM stock, much of it through Lazzaro, "on the premise that Lazzaro was privy to certain information not otherwise available to the general public." *Id.* ¶ 15, App. 10. Their shares initially increased dramatically in price, but ultimately declined to substantially below the purchase price when the joint mining venture fell through. *Id.* ¶¶ 22–26, App. 13–14.[4]

---

[2] Gold exploration has been conducted in Surinam for more than 100 years, but production has declined dramatically since early in this century. Complaint ¶ 11, App. 9. The areas in which TONM had been engaged in exploration "were historically mined by Surinamese natives using primitive methods," and were accessible to the outside world "primarily by motorized canoes and helicopter." *Id.* ¶ 12, App. 9. Lazzaro allegedly told the investors that TONM's discovery "compared favorably to, if not better than, those in South Africa," and that development "would not require deep mining" because "[g]eologists in Surinam were finding gold nuggets in dry creek beds." *Id.* ¶ 16, App. 11.

[3] Lazzaro also allegedly told the investors that, after the announcement, TONM shareholders "would *automatically* receive" additional stock in TONM's subsidiary, International Gold and Diamond Exploration Corp., Inc., "without the payment of any additional monies." *Ibid.* (emphasis in original).

[4] The respondents purchased the stock in late 1979 and early 1980 for between $1.50 and $3 per share, and the price of the stock rose to $7 per

Lazzaro and Neadeau are alleged to have made the representations set forth above knowing that the representations "were untrue and/or contained only half-truths, material omissions of fact and falsehoods,"[5] intending that the respondents would rely thereon, and for the purpose of "influenc[ing] and manipulat[ing] the price of TONM stock" so as "to profit themselves through the taking of commissions and secret profits." *Id.* ¶¶ 23, 30, 38, App. 13, 15–16.[6] The respondents contended that this scheme violated, *inter alia,* § 10(b) of the Securities Exchange Act of 1934, 48 Stat. 891, 15 U. S. C. § 78j(b),[7] and Securities and Exchange Commis-

---

share by the fourth quarter of 1980. *Id.* ¶ 22, App. 13. "[S]ome or all" of the respondents claim to have told Lazzaro at this time that they wanted to sell their shares, but "Lazzaro stated that he would let the plaintiffs know when to sell the TONM stock, and that they should not sell just because the stock had reached $7.00/share because it would go higher still." *Ibid.* The stock then plummeted "to approximately $1.00 per share" by the end of 1980, and fell to "less than . . . $1.00 a share" early the next year. *Id.* ¶¶ 24–25, App. 14.

[5] In the alternative, Lazzaro and Neadeau are alleged to have made these representations "recklessly with wanton disregard for the truth." *Id.* ¶ 32, App. 15.

[6] Neadeau is alleged to have owned approximately 100,000 shares of the outstanding common stock of TONM, and Lazzaro is alleged to have "controlled over a million shares of TONM stock through stock purchased by himself and his clients." *Id.* ¶¶ 8, 23, App. 8, 13. See also *id.* ¶ 16, App. 12 ("Lazzaro and his relatives owned a large block of TONM stock"). The investors charged that "Lazzaro could thereby and did influence and manipulate the price of TONM stock through purchases and sales thereof, and through the dissemination of false information to plaintiffs and others." *Id.* ¶ 23, App. 13.

[7] That section provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

.        .        .        .        .

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as

sion (SEC) Rule 10b–5 promulgated thereunder, 17 CFR § 240.10b–5 (1984).[8] They sought capital losses and lost profits, punitive damages, and costs and attorney's fees. App. 26.[9]

The District Court dismissed the complaint for failure to state a claim. The court reasoned that "trading on insider information is itself a violation of rule 10b–5" and that the allegations in the complaint demonstrated that the respondents themselves had "violated the particular statutory provision under which recovery is sought." App. to Pet. for Cert. C–2. Thus, the court concluded, the respondents were *in pari delicto* with Lazzaro and Neadeau and absolutely barred from recovery. *Ibid.*

The Court of Appeals for the Ninth Circuit reversed. *Berner* v. *Lazzaro,* 730 F. 2d 1319 (1984). Although it

---

necessary or appropriate in the public interest or for the protection of investors."

[8] That Rule provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

[9] In addition, the respondents sought recovery pursuant to § 17(a) of the Securities Act of 1933, 48 Stat. 84, as amended, 15 U. S. C. § 77q(a), see Complaint ¶¶ 48–50, App. 20, which the parties and the courts below have treated as comparable to § 10(b) for purposes of applying the *in pari delicto* defense. We express no view as to whether a private right of action exists under § 17(a). Compare *Keys* v. *Wolfe,* 709 F. 2d 413, 416 (CA5 1983), with *Stephenson* v. *Calpine Conifers II, Ltd.,* 652 F. 2d 808, 815 (CA9 1981). The respondents also alleged various other federal claims and pendent state-law claims that are not before us.

assumed that the respondents had violated the federal securities laws, *id.*, at 1324, the court nevertheless concluded that "securities professionals and corporate officers who have allegedly engaged in fraud should not be permitted to invoke the *in pari delicto* doctrine to shield themselves from the consequences of their fraudulent misrepresentation," *id.*, at 1320. The Court of Appeals noted that this Court had sharply restricted the availability of the *in pari delicto* defense in antitrust actions, see *Perma Life Mufflers, Inc.* v. *International Parts Corp.*, 392 U. S. 134 (1968), and concluded that, essentially for three reasons, there was no basis "for creating a different rule for private actions initiated under the federal securities laws," 730 F. 2d, at 1322. First, the court reasoned that, in cases such as this, defrauded tippees are not in fact "equally responsible" for the violations they allege. *Ibid.* Second, the court believed that allowing the defense in these circumstances would be "totally incompatible with the overall aims of the securities law" because the threat of a private damages action is necessary to deter "insider-tipster[s]" from defrauding the public. *Id.*, at 1323. Finally, the court noted the availability of means other than an outright preclusion of suit to deter tippees from trading on inside information. *Id.*, at 1324, n. 3.

The lower courts have divided over the proper scope of the *in pari delicto* defense in securities litigation.[10] We granted certiorari. 469 U. S. 1105 (1985). We affirm.

---

[10] See, *e. g.*, *Tarasi* v. *Pittsburgh National Bank*, 555 F. 2d 1152 (CA3) (allowing defense), cert. denied, 434 U. S. 965 (1977); *Malamphy* v. *Real-Tex Enterprises, Inc.*, 527 F. 2d 978 (CA4 1975) *(per curiam)* (sustaining submission of defense to jury); *Woolf* v. *S. D. Cohn & Co.*, 515 F. 2d 591, 601–605 (CA5 1975) (rejecting defense on facts of case), on rehearing, 521 F. 2d 225, vacated and remanded on other grounds, 426 U. S. 944 (1976); *Kuehnert* v. *Texstar Corp.*, 412 F. 2d 700 (CA5 1969) (allowing defense); *Kirkland* v. *E. F. Hutton & Co.*, 564 F. Supp. 427, 433–437 (ED Mich. 1983) (rejecting defense on motion for summary judgment); *Grumet* v. *Shearson/American Express, Inc.*, 564 F. Supp. 336 (NJ 1983) (allowing

## II

The common-law defense at issue in this case derives from the Latin, *in pari delicto potior est conditio defendentis:* "In a case of equal or mutual fault . . . the position of the [defending] party . . . is the better one." [11]   The defense is grounded on two premises: first, that courts should not lend their good offices to mediating disputes among wrongdoers; [12] and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality. [13]   In its classic for-

---

defense); *Xaphes* v. *Shearson, Hayden, Stone, Inc.,* 508 F. Supp. 882, 884–887 (SD Fla. 1981) (rejecting defense on motion to dismiss); *Moholt* v. *Dean Witter Reynolds, Inc.,* 478 F. Supp. 451 (DC 1979) (rejecting defense on motion for summary judgment); *In re Haven Industries, Inc.,* 462 F. Supp. 172, 177–180 (SDNY 1978) (allowing defense); *Nathanson* v. *Weis, Voisin, Cannon, Inc.,* 325 F. Supp. 50 (SDNY 1971) (rejecting defense); *Wohl* v. *Blair & Co.,* 50 F. R. D. 89 (SDNY 1970) (denying motion to strike defense).   Cf. *Silverberg* v. *Paine, Webber, Jackson & Curtis, Inc.,* 710 F. 2d 678, 691 (CA11 1983); *Mallis* v. *Bankers Trust Co.,* 615 F. 2d 68, 76 (CA2 1980), cert. denied, 449 U. S. 1123 (1981); *Can-Am Petroleum Co.* v. *Beck,* 331 F. 2d 371, 373 (CA10 1964).

[11] Black's Law Dictionary 711 (5th ed. 1979).

[12] See, *e. g., Higgins* v. *McCrea,* 116 U. S. 671, 685 (1886); *Austin's Adm'x* v. *Winston's Ex'x,* 11 Va. 33, 47 (1806) ("He who comes here for relief must draw his justice from pure fountains").   See also *Holman* v. *Johnson,* 1 Cowp. 341, 343, 98 Eng. Rep. 1120, 1121 (K. B. 1775):

"The objection, that a contract is immoral or illegal as between plaintiff and defendant, sounds at all times very ill in the mouth of the defendant.   It is not for his sake, however, that the objection is ever allowed . . . .   The principle of public policy is this; ex dolo malo non oritur actio [out of fraud no action arises] . . . .   It is upon that ground the Court goes; not for the sake of the defendant, but because they will not lend their aid to such a plaintiff."

[13] See, *e. g., McMullen* v. *Hoffman,* 174 U. S. 639, 669–670 (1899):

"To refuse to grant either party to an illegal contract judicial aid for the enforcement of his alleged rights under it tends strongly towards reducing the number of such transactions to a minimum.   The more plainly parties understand that when they enter into contracts of this nature they place themselves outside the protection of the law, so far as that protection consists in aiding them to enforce such contracts, the less inclined will they be

mulation, the *in pari delicto* defense was narrowly limited to situations where the plaintiff truly bore at least substantially equal responsibility for his injury, because "in cases where both parties are in delicto, concurring in an illegal act, it does not always follow that they stand in pari delicto; for there may be, and often are, very different degrees in their guilt." 1 J. Story, Equity Jurisprudence 304–305 (13th ed. 1886) (Story). Thus there might be an "inequality of condition" between the parties, *id.*, at 305, or "a confidential relationship between th[em]" that determined their "relative standing" before a court, 3 J. Pomeroy, Equity Jurisprudence § 942a, p. 741 (5th ed. 1941) (Pomeroy). In addition, the public policy considerations that undergirded the *in pari delicto* defense were frequently construed as precluding the defense even where the plaintiff bore substantial fault for his injury: "[T]here may be on the part of the court itself a necessity of supporting the public interests or public policy in many cases, however reprehensible the acts of the parties may be." 1 Story 305. Notwithstanding these traditional limitations, many courts have given the *in pari delicto* defense a broad application to bar actions where plaintiffs simply have been involved generally in "the same sort of wrongdoing" as defendants. *Perma Life Mufflers, Inc.* v. *International Parts Corp.*, 392 U. S., at 138.[14]

In *Perma Life*, we emphasized "the inappropriateness of invoking broad common-law barriers to relief where a private suit serves important public purposes." *Ibid.* That case involved a treble-damages action against a Midas Muffler franchisor by several of its dealers, who alleged that the franchise agreement created a conspiracy to restrain trade in violation

---

to enter into them. In that way the public secures the benefit of a rigid adherence to the law."

[14] See also *Tarasi* v. *Pittsburgh National Bank,* 555 F. 2d, at 1157; L. Loss, Fundamentals of Securities Regulation 1197 (1983); Comment, Availability of an *In Pari Delicto* Defense in Rule 10b–5 Tippee Suits, 77 Colum. L. Rev. 1084, 1086, n. 15 (1977).

of the Sherman and Clayton Acts.[15]   The lower courts barred the action on the grounds that the dealers, as parties to the agreement, were *in pari delicto* with the franchisor.   In reversing that determination, the opinion for this Court emphasized that there was no indication that Congress had intended to incorporate the defense into the antitrust laws, which "are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating [illegal] business behavior." *Id.*, at 139.   Accordingly, the opinion concluded that "the doctrine of *in pari delicto*, with its complex scope, contents, and effects, is not to be recognized as a defense to an antitrust action." *Id.*, at 140.   The opinion reserved the question whether a plaintiff who engaged in "truly complete involvement and participation in a monopolistic scheme"—one who "aggressively support[ed] and further[ed] the monopolistic scheme as a necessary part and parcel of it"—could be barred from pursuing a damages action, finding that the muffler dealers had relatively little bargaining power and that they had been coerced by the franchisor into agreeing to many of the contract's provisions. *Ibid.*

In separate opinions, five Justices agreed that the concept of "equal fault" should be narrowly defined in litigation arising under federal regulatory statutes.[16]   "[B]ecause of the strong public interest in eliminating restraints on competition, . . . many of the refinements of moral worth demanded of plaintiffs by . . . many of the variations of *in pari delicto* should not be applicable in the antitrust field." *Id.*, at 151 (MARSHALL, J., concurring in result).   The five Justices concluded, however, that where a plaintiff truly bore at least substantially equal responsibility for the violation, a defense

---

[15] Sherman Act, 26 Stat. 209 *et seq.*, as amended, 15 U. S. C. § 1 *et seq.;* Clayton Act, 38 Stat. 730 *et seq.*, as amended, 15 U. S. C. § 12 *et seq.*

[16] See 392 U. S., at 145 (WHITE, J., concurring); *id.*, at 147–148 (Fortas, J., concurring in result); *id.*, at 148–149, 151 (MARSHALL, J., concurring in result); *id.*, at 154–155 (Harlan, J., joined by Stewart, J., concurring in part and dissenting in part).

based on such fault—whether or not denominated *in pari delicto*—should be recognized in antitrust litigation.[17]

Bateman Eichler argues that *Perma Life*—with its emphasis on the importance of analyzing the effects that fault-based defenses would have on the enforcement of congressional goals—is of only marginal relevance to a private damages action under the federal securities laws. Specifically, Bateman Eichler observes that Congress *expressly* provided for private antitrust actions—thereby manifesting a "desire to go beyond the common law in the antitrust statute in order to provide substantial encouragement to private enforcement and to help deter anticompetitive conduct"—whereas private rights of action under § 10(b) of the Securities Exchange Act of 1934 are merely *implied* from that provision[18]—thereby, apparently, supporting a broader application of the *in pari delicto* defense. Brief for Petitioner 32. Bateman Eichler buttresses this argument by observing that, unlike the Sherman and Clayton Acts, the securities laws contain savings provisions directing that "[t]he rights and remedies provided by [those laws] shall be in addition to any and all other rights and remedies that may exist at law or in equity"[19]—again, apparently, supporting a broader scope for fault-based defenses than recognized in *Perma Life*.

---

[17] JUSTICE WHITE concluded that "the *in pari delicto* defense in its historic formulation is not a useful concept" in antitrust law, but emphasized that he "would deny recovery where plaintiff and defendant bear substantially equal responsibility for injury resulting to one of them." *Id.*, at 143, 146. The other four Justices would have allowed explicit, though limited, use of the *in pari delicto* defense itself. *Id.*, at 147 (Fortas, J., concurring in result); *id.*, at 148–149 (MARSHALL, J., concurring in result); *id.*, at 153 (Harlan, J., joined by Stewart, J., concurring in part and dissenting in part).

[18] See *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723, 730 (1975); *Superintendent of Insurance* v. *Bankers Life & Cas. Co.*, 404 U. S. 6, 13, n. 9 (1971).

[19] See § 16 of the Securities Act of 1933, 48 Stat. 84, 15 U. S. C. § 77p; § 28(a) of the Securities Exchange Act of 1934, 48 Stat. 903, as amended, 15 U. S. C. § 78bb(a).

310

We disagree. Nothing in *Perma Life* suggested that public policy implications should govern only where Congress expressly provides for private remedies; the classic formulation of the *in pari delicto* doctrine itself required a careful consideration of such implications before allowing the defense. See *supra*, at 307. Moreover, we repeatedly have emphasized that implied private actions provide "a most effective weapon in the enforcement" of the securities laws and are "a necessary supplement to Commission action." *J. I. Case Co.* v. *Borak*, 377 U. S. 426, 432 (1964); see also *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723, 730 (1975). In addition, we have eschewed rigid common-law barriers in construing the securities laws. See, *e. g., Herman & MacLean* v. *Huddleston*, 459 U. S. 375, 388–389 (1983) (common-law doctrines are sometimes of "questionable pertinence" in applying the securities laws, which were intended "to rectify perceived deficiencies in the available common-law protections by establishing higher standards of conduct in the securities industry"); *A. C. Frost & Co.* v. *Coeur d'Alene Mines Corp.*, 312 U. S. 38, 43 (1941) (rejecting the unclean-hands defense on the facts of the case because it would "seriously hinder rather than aid the real purpose" of the securities laws).[20] We therefore conclude that the views expressed in *Perma Life* apply with full force to implied causes of action under the federal securities laws. Accordingly, a private action for damages in these circumstances may be barred on the grounds of the plaintiff's own culpability only where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks

---

[20] In *Frost*, we quoted approvingly from an SEC memorandum arguing that " '[i]t appears to us to be entirely immaterial whether in such a case, the agreement is labelled "void" or the parties are held to be "in pari delicto." There, labels, as often is the case, merely state the conclusion reached, but do not aid in solution of the problem. The ultimate issue is whether the result in the particular case would effectuate or frustrate the purposes of the Act.' " 312 U. S., at 44, n. 2.