**Benjamin ROTHBERG**

v.

**Sanford M. ROSENBLOOM and Sanford M. Rosenbloom as Executor of the Estate of David B. Rosenbloom, Deceased.**

**Civ. A. No. 83–2387.**

United States District Court, E.D. Pennsylvania.

Feb. 14, 1986.

Stewart Dalzell, Alfred W. Putnam, Jr., Fred Greenberg, Drinker Biddle & Reath, Philadelphia, Pa., for plaintiff.

Tom P. Monteverde, Jean C. Hemphill, Monteverde, Hemphill, Maschmeyer & Obert, Philadelphia, Pa., for defendant.

## MEMORANDUM

KATZ, District Judge.

In this case the financier of crooked insider trading deals seeks to recover his losses. I find him barred by illegality. I reject his attempt to turn on its head a recent decision of the Supreme Court of the United States which allows disappointed tippees to blow the whistle on their tippers. In this case, I allow the touts to blow the whistle on the financiers of insider trading in "hot issues" of stock. I leave these co-conspirators where the market left them. Such an approach enhances the purposes of the securities laws. Future bankrollers of illegal trading are less likely to provide the wherewithal to weak insiders who sell inside corporate information for a stake in the deal. The providers of capital have an aversion to risk. My decision puts them at risk, or at least uncertainty. In the future, insider touts will have more difficulty finding rich co-venturers to fund joint ventures in crime.

### Procedural History

Plaintiff Benjamin Rothberg ("Rothberg") brought this suit to enforce two promissory notes, dated February 7, 1979. Defendant Sanford M. Rosenbloom ("Sanford") signed one of the notes, which obliges him to pay Rothberg $441,050 on demand. This note was unconditionally guaranteed by Sanford's brother, defendant David Rosenbloom ("David").[1] The other note was signed by David and obliges him to pay Rothberg $135,000 on demand.

Defendants concede that the notes and guaranty are genuine, that they were duly delivered to Rothberg, and that Rothberg made a demand for payment. Neverthe-

less, they have refused to honor the notes and guarantee. The defendants have proved that the notes represent obligations in two joint ventures to make secret profits from insider trading in violation of federal securities law.[2]

After a bench trial, I ruled that both notes and the guarantee were unenforceable under the defense of *in pari delicto*. The notes represented losses sustained as a result of illegal insider trading: Rothberg, as part of two joint ventures, traded on inside information provided by David. This Court would not aid the plaintiff to recover his losses under those circumstances, any more than if the notes were given to secure losses in a narcotics venture. Rothberg appealed, contending that I had erred in finding insider trading violations and in admitting evidence of other joint ventures in which the parties had been involved. Rothberg also argued that, as a matter of law, the promissory notes and guarantee were not subject to the *in pari delicto* defense.

The Third Circuit affirmed my finding that the joint venturers had engaged in insider trading in violation of the securities law. *Rothberg v. Rosenbloom*, 771 F.2d 818, 819–23 (3d Cir.1985). The Court also upheld admission of evidence of other similar joint ventures in which the parties engaged, under Rule 404(b) of the Federal Rules of Evidence. Such evidence was admissible to show the nature and purpose of the two joint ventures in question.

With respect to my application of the *in pari delicto* defense, the panel remanded the case to me in view of a Supreme Court case, issued after my opinion, which undercut the rationale of the Third Circuit decision on which I relied.

In my Bench Opinion, I found that the conduct of Rothberg in financing the joint ventures to profit secretly on tips from

---

1. David Rosenbloom died on May 12, 1985. Sanford Rosenbloom is the executor of David's estate.

2. In particular, defendants proved that the underlying obligations were incurred in connec-

tion with joint ventures that violated section 10(b) of the Securities Exchange Act of 1934 as amended (15 U.S.C. § 78j(b) ) and Rule 10(b)–5 promulgated under section 10(b) by the Securities and Exchange Commission.

misappropriated inside information was of sufficient magnitude to apply *in pari delicto* under *Tarasi v. Pittsburgh National Bank,* 555 F.2d 1152 (3d Cir.1977), *cert. denied,* 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 451 (1977). On the basis of *Tarasi,* I found that plaintiff was not entitled to recover.

However, the more recent Supreme Court decision in *Bateman Eichler, Hill Richards, Inc. v. Carl F. Berner, et al.,* —— U.S. ——, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985), called into question the Third Circuit's holding in *Tarasi.* Accordingly, I must make findings under the standards in *Bateman Eichler.*

In particular, I must make findings as to 1) whether Rothberg bears at least substantially equal responsibility for the violations he seeks to redress, and 2) whether preclusion of Rothberg's suit would significantly interfere with the effective enforcement of the securities laws and protection of the investing public. *Rothberg v. Rosenbloom,* 771 F.2d at 824.

For the reasons below, I find that this case presents a "different mix of deterrent incentives" from that in *Bateman Eichler* and that the defense of *in pari delicto* applies. *Bateman Eichler,* 105 S.Ct. at 2632. Rothberg, as the instigator and financier of the joint ventures involved, bears "at least substantially equal responsibility" for the violations of federal securities laws which resulted in the trading losses he seeks to recoup. *Id.* at 2629. Moreover, precluding Rothberg will enhance, rather than significantly interfere with, the enforcement of the securities laws and will protect the investing public by encouraging whistleblowing on illegal insider trading.

## FINDINGS OF FACT

1. Plaintiff Benjamin Rothberg ("Rothberg") is the payee of two interest-bearing promissory notes which he seeks to enforce. Defendant Sanford M. Rosenbloom ("Sanford") is the maker of one of the notes, which obliges him to pay Rothberg $441,050 on demand. Sanford's brother, defendant David Rosenbloom ("David"),

unconditionally guaranteed Sanford's note. Ex. P–32.

2. David is the maker of the other note, which obliges him to pay Rothberg $135,000 on demand. Ex. P–39.

3. David and Sanford do not contest that the notes and guaranty are genuine, that they were duly delivered to Rothberg, and that Rothberg made a demand for payment.

4. Rothberg, who was sixty-six at the time of trial, is a citizen and resident of New Jersey. Educated as a chemist, Rothberg worked with his father for a series of enterprises that eventually became Montrose Chemical Corp. and then worked for Montrose's successor, Baldwin-Montrose, when Montrose merged with two other companies. Rothberg was an officer and director of Montrose. Rothberg also served as a director of Mallory-Randall Corp. At the time of trial, Rothberg was an investor and a technical consultant for Cris Craft. N.T. 2.22–23, 2.40, 2.43–44, 2.45.

5. Defendant David Rosenbloom ("David"), who died on May 12, 1985, was a citizen and resident of Pennsylvania. He was 59 years old at the time of trial. David graduated from the University of Pennsylvania and attended two law schools without finishing the course of study at either. David had served as an officer and director of a number of corporations, including Home Products Sales Co., Centlivre Brewing Company, Harvey's Stores, Eastern Air Devices and Centlivre's successor. In the late 1960's David was a director and Chairman of the Executive Committee of Nytronics, Inc. and held the same positions with Mallory-Randall Corp. At the time of trial, David was unemployed. N.T. 1.110–1.115, 3.45.

6. At the time of trial, defendant Sanford Rosenbloom ("Sanford") was 55 years old and was a citizen and resident of Pennsylvania. Sanford is currently a partner in a law firm, where he has been practicing since 1955. His speciality is real estate

law; he has limited knowledge of federal securities laws. N.T. 1.25–28, 3.2.

7. At the times material to this litigation, Benson Selzer ("Selzer") was a registered representative with a securities brokerage firm in New York. Selzer was a personal friend and business associate of David's and was part of a group, along with David, that acquired control of Nytronics. In addition to being employed as a stockbroker, Selzer served as a vice president and director of Nytronics, Inc. and also held the same positions with Mallory-Randall. At all times relevant to this lawsuit, Selzer was Rothberg's stockbroker. N.T. 2.28, 3.49–53.

8. Rothberg met David when Centlivre, Montrose Chemical and Baldwin merged. After the merger, the two met irregularly on business and more often, but not regularly, at social occasions. N.T. 3.47–48.

9. David became acquainted with Selzer during the time he lived in New York City and introduced him to Rothberg. N.T. 3.48–50.

10. At the time at which the two entered into joint venture agreements, Sanford and Rothberg were barely acquainted. At trial Rothberg could only remember having met Sanford on two occasions prior to 1981. N.T. 2.74–76.

11. Prior to this action, Rothberg and David were defendants in litigation instituted by the S.E.C. in which David was alleged to have provided Rothberg and others with insider information on which Rothberg and others traded. *See SEC v. Shapiro*, 349 F.Supp. 46 (S.D.N.Y.1972), *aff'd.* 494 F.2d 1301 (2d Cir.1974).

12. The promissory notes and guarantee which Rothberg seeks to enforce represent acknowledgements of debts incurred in connection with the last two of six joint venture agreements executed between February of 1968 and May of 1969. Under those agreements, Rothberg invested sums totalling in excess of $1,365,000 to purchase securities of various publicly owned businesses.

13. Under the terms of each of these joint ventures, Rothberg contributed all the capital involved, except for $100 in cash contributed by the co-venturer (either David or Sanford). Rothberg also agreed to surrender to his joint venturer of record (either David or Sanford) the power to sell the securities involved or their equivalent over specified periods of time and to share equally with that party any profits derived from the investment. However, the other joint venturer was to indemnify Rothberg against any losses sustained by the joint venture. Each joint venture was to last for two years. In substance, these were almost all ventures in crime, i.e., to trade illegally on inside information. The ventures were structured to protect Rothberg's creditor position as their financier.

14. All of the joint ventures but the first involved purchasing securities of firms in which either David or Selzer, or both, served as officers or directors or of companies which were targets for mergers with companies in which David or Selzer, or both, were officers or directors.

15. Selzer's brokerage firm, with Selzer as its representative, handled all of Rothberg's investments in the joint ventures. N.T. 3.62–63.

### THE JOINT VENTURES

I. *Joint Venture of February 14, 1968*

(Harsco Joint Venture)

16. On February 14, 1968, Rothberg entered into a Joint Venture Agreement with David. Ex. D–26. Rothberg contributed 10,300 shares of stock of the Harsco Corporation, worth $239,005.42. David contributed $100.00 in cash. Profits were to be evenly divided, but David guaranteed Rothberg against loss on this investment. David was to make investment decisions for the joint venture. *Id.* at ¶ 4.

17. Rothberg purported to recall nothing concerning the circumstances involved in this investment. N.T. 2.60. However, I credit David's version of the events surrounding this transaction. David testified that Selzer received information that the

management of Harsco was about to embark on an aggressive program of acquisitions which was likely to cause the stock to rise. N.T. 3.61–63.

18. According to Harsco's Form 10K for 1968, Harsco did in fact acquire or organize five domestic and two foreign subsidiaries in 1968. Ex. D–31.

19. This joint venture ended profitably, with over $34,000 being divided between David and Rothberg. N.T. 3.11.

## II. *Joint Venture of February 15, 1968*

(Nytronics Joint Venture)

20. On February 15, 1968, the day after the Harsco Joint Venture Agreement was executed, Rothberg entered into a second Joint Venture Agreement, this time with Sanford. Rothberg contributed Nytronics debentures and 600 shares of Nytronics stock. These securities had a value of $257,661.17. Sanford's only contribution to the joint venture was $100.00 in cash. Ex. D–12.

21. Under the terms of this agreement, the parties were to share profits equally, but Sanford was to indemnify Rothberg against any losses which the joint venturers suffered. *Id.* at ¶ 2. In addition, the agreement states that Sanford was to make investment decisions for the joint venture during its existence. The joint venture was to last for two years.

22. In addition to this written agreement, the parties had an oral understanding among themselves as to the structure of the joint venture. Rothberg testified that, in making his investment, he did not rely on either Sanford's investment advice or Sanford's guarantee against loss. Rather he actually relied on David's investment advice and David's guarantee of Sanford's performance under the Agreement. N.T. 2.70–73. Rothberg maintained that he had a written guarantee from David against loss but could not produce one. David testified that he gave Rothberg an oral guarantee against loss, and I credited David's testimony that his guarantee was oral. N.T. 3.64, 3.67–68.

23. At the time these investments in Nytronics were made, David was Chairman of the Executive Committee at Nytronics. He and Selzer were both directors of that concern. N.T. 2.84.

24. This joint venture was also profitable. Rothberg earned a profit of $127,960.40, which he divided equally with Sanford. Ex. D–18.

25. Rothberg purported to have no present recollection of what led him to enter this joint venture. N.T. 2.90–92. However, I credit David's account. David testified that he and Selzer provided Rothberg with information concerning various mergers which Nytronics was contemplating and subsequently did make, but had not yet publicly announced. N.T. 3.65–67.

## III. *Joint Venture of December 6, 1968*

(Eastern Air Devices Joint Venture)

26. The third Joint Venture Agreement, executed on December 6, 1968, involved Rothberg's contribution of $50,299.50, which consisted of 1,700 shares of Eastern Air Devices, 1,000 shares of National Tel-Tronics, and 900 shares of Gondas Corporation. Sanford, the co-venturer, contributed only $100.00 in cash. All other major provisions of this agreement were identical to those of the Nytronics Joint Venture: the joint venture was to last two years, the parties were to divide profits equally, but Sanford was to bear all losses incurred by the joint venture. The agreement also delegated investment decisions to Sanford. Ex. D–32.

27. Rothberg claimed to have no present recollection of what caused him to make these investments. N.T. 2.114. I credit David's testimony as to the circumstances surrounding this venture. David testified that he and Selzer furnished Rothberg with information concerning Eastern Air Devices and its 80%-owned subsidiary, National Tel-Tronics. Both David and Selzer were directors and David was Chairman of the Executive Committee of Nytronics at the time Rothberg made his investments. N.T. 3.70. David and Selzer

told Rothberg about a planned merger between Nytronics and Eastern Air Devices. N.T. 3.71. The public learned about this merger three days after Rothberg made his investment and entered into the Joint Venture Agreement. N.T. 2.125, Ex. D–43. Other information which David and Selzer made available to Rothberg in this connection included the corporate plan to merge National Tel-Tronics, as well as Eastern Air Devices, into Nytronics and to install the chief executive of Eastern Air Devices as the chief operating officer of Nytronics. N.T. 3.71–72.

28. With respect to the securities of Gondas Corporation ("Gondas"), Selzer and two principals of his brokerage firm, David and Oliver Grace, were directors of Gondas at the time Rothberg made this investment. Ex. D–45. According to David's testimony, which I credit, Selzer furnished Rothberg with as yet unpublished information concerning the substantially increased earnings and prospective acquisitions of Gondas. N.T. 3.72–73.

29. This joint venture was not profitable, ultimately losing $16,736.75. Although the Joint Venture Agreement stated that Sanford was to bear all losses, the record reflects that Sanford paid Rothberg only $1,736.75 while David paid Rothberg $15,000. Exs. D–48, D–49.

IV. *Joint Venture Agreement of February 9, 1968*

(Federal Pacific Electric Venture)

30. The parties to this Joint Venture Agreement, executed on January 20, 1969, were Rothberg and Sanford. Rothberg contributed 10,000 shares of Federal Pacific Electric stock, valued at $267,312.08, to the joint venture. Sanford's contribution was $100.00 in cash. Otherwise, this joint venture was similar to the others: the venture was to last two years, the joint venturers were to divide profits evenly with Sanford bearing all losses, and Sanford was to

make investment decisions on behalf of the joint venture. Ex. D–51.

31. This joint venture made $21,319.07, which the joint venturers split. Ex. D–55.

32. Once again, Rothberg purported to have no present recollection or records which established the precise reason for his having made the investment. N.T. 2.102–03. However, I credit David's account. David testified that the investment was made because he and Selzer told Rothberg that Nytronics had begun, without public announcement, to acquire stock in Federal Pacific Electric in the hope of facilitating a merger. Nytronics did in fact acquire more Federal Pacific Electric stock and attempted to negotiate a merger. Eventually, Federal Pacific Electric concluded a merger with another company which bought Federal Pacific stock from Nytronics and from Rothberg. N.T. 3.75–77.

V. *Joint Venture of April 18, 1969*

(Mallory-Randall Joint Venture)

33. The losses sustained by this Joint Venture, executed on April 18, 1969, gave rise to the note for $135,000, signed by David, which Rothberg seeks to enforce. The Joint Venture was between Sanford (as Trustee for his parents) and Rothberg. Under the terms of the agreement, Rothberg contributed 10,800 shares of stock of the Mallory Randall Corp., valued at $109,836.00. Sanford contributed $100 in cash. As in the other agreements, the venture was to terminate in two years, Rothberg and Sanford were to divide profits evenly, but Sanford, as trustee, was to bear all losses incurred by the venture. Sanford was given the authority to make investment decisions on behalf of the Joint Venture. Ex. P–1.

34. In my Bench Opinion, I found that the joint venturers had illegally traded on inside information that David had obtained as an officer and director of Mallory Randall and provided to Rothberg.[3] The Third

3. In particular, David informed Rothberg that Carolina Toy, a company which Mallory Randall was interested in acquiring, would have banner earnings for a particular year.

Circuit affirmed this finding. *Rothberg v. Rosenbloom*, 771 F.2d at 820–21.

## VI. *The Joint Venture Agreement of May 28, 1969*

(The Gulton Joint Venture)

35. The losses sustained by this joint venture between Sanford and Rothberg, executed on May 28, 1969, gave rise to the note and guarantee for $441,050 which Rothberg seeks to enforce. This joint venture, executed by Rothberg and Sanford, was similar to the others. Under its terms, the venture was to terminate in two years, Rothberg put up all the capital, except for $100.00 in cash, and surrendered the power to make investment decisions to Sanford. Sanford was to bear all the losses but share evenly in the profits. In my Bench Opinion, I found that the joint venturers had illegally traded on inside information that David acquired as an officer and director of Nytronics and then conveyed to Rothberg.[4]

*Summary of Findings With Respect to the Joint Ventures*

36. From the beginning of these joint ventures, Rothberg relied on David's insider tips.

37. Rothberg admitted that he had no knowledge of Sanford's investment acumen. In addition, Rothberg learned from David that Sanford's assets, net worth, income and prospects were not substantial. N.T. 2.29, 2.77–81.

38. At trial, Rothberg contended that David had provided him with contemporaneous written guarantees against loss for the joint ventures in which Sanford was named as co-venturer. However, Rothberg was unable to produce any *contemporaneous* written guarantees. David admitted that he had guaranteed Rothberg against loss in those ventures, but that these guarantees were oral.

39. At Rothberg's request, David later provided Rothberg with written guarantees, backdated to the dates of the extant joint ventures which had sustained losses. Exs. P–34, P–35. *See* N.T. 2.118–24, 2.174–77, 3.10–11, 3.19, 3.20–21, 3.24–27, 3.68, 3.78–79.

40. Sanford agreed to enter into all but the Harsco Joint Venture agreement (to which he was not a party) in exchange for his receiving himself or, in one instance, as trustee for his parents, a share of any profits. In addition, David gave Sanford his oral guarantee against loss in these ventures. N.T. 1.46–51, 1.58–61, 1.91–93.

41. David and Sanford executed various extensions of the Mallory Randall and Gulton joint ventures, and, ultimately, documented the obligations which they owed Rothberg by executing various instruments, including the notes and guarantee Rothberg seeks to enforce. Exs. P–2—P–6, P–8, P–8A, P–32, P–39; N.T. 1.55–58, 1.63–74, 1.76–79, 1.94–96, 2.35–37.

42. I credit David's version of the circumstances surrounding the formation of the joint ventures. David testified that the joint ventures sprang from Rothberg's desire to make more money for himself. Rothberg complained that he was not making enough money from his investments in Nytronics and that David and Selzer owed him something for helping the three of them gain control of Nytronics. N.T. 3.54–55. In response to Rothberg's pressure, David and Selzer offered the scheme to provide Rothberg with inside information, and Rothberg agreed, contingent on a guarantee against loss from David. N.T. 3.56–57; 3.60–63.

43. Although Rothberg did not come up with the specific details of the plans to trade on inside information, it was his pressure on David to come up with a means to make Rothberg more money, in short, his greed, that led to the scheme to trade on

---

**4.** Specifically, David informed Rothberg that Nytronics would merge with another company, Gulton Industries, and that Dr. Gulton would swing or deliver the votes of the board of directors of Gulton to approve the transaction on a stock for stock basis with respect to Gulton's public shareholders. Dr. Gulton himself had sold his own holdings for cash. The Third Circuit affirmed this finding. *Rothberg v. Rosenbloom*, 771 F.2d at 821–23.

inside information by means of the joint ventures, including the Mallory Randall and Gulton deals. Rothberg negotiated the structure of the joint ventures with the defendants. Exs. D–122—D–126, D–128—D–132, D–136, D–138; N.T. 3.6–10, 3.60–63.

44. Rothberg also financed the joint ventures. Without his participation the joint ventures could not have come about. Neither David nor Selzer had sufficient money of their own to invest at that time. N.T. 3.54.

45. In my bench opinion, I found that Sanford was unaware of the illegal insider trading until about the onset of the litigation. N.T. 3.125.

46. Rothberg provided the capital to finance the joint ventures. In exchange, David provided inside information and was to receive half of any earned profits. Because David knew he could not legally enter into an agreement with Rothberg to purchase the stock invested, David appointed Sanford to receive his share of any profits earned from the joint ventures. Because of his superior bargaining position, Rothberg extracted a guarantee against loss from David. On paper, the Mallory Randall and Gulton joint ventures were between Sanford and Rothberg. However, Rothberg relied on David's tips and guarantee against loss. As Rothberg testified, Sanford's guarantee against loss was virtually worthless. But as part of the scheme, to disguise the illegal insider trading, David did not initially document his oral guarantees to Rothberg against loss. Only after the value of the stocks in question had declined in value and upon Rothberg's insistence, did David provide written guarantees against loss to Rothberg. These guarantees were backdated to the dates of execution of the Mallory Randall and Gulton joint ventures.

47. By providing the financing which made the investments in question possible, Rothberg knowingly profited, and enabled others to profit, from inside information from which David and Selzer were legally prohibited from profiting. If Rothberg had not furnished such financing, the trades in question would not have occurred.

48. Rothberg bears at least substantially equal responsibility with the defendants for the illegal conduct from which the notes and guarantee in this suit derive. By pressuring David to find a way to get him more money, Rothberg caused the formation of the Mallory Randall and Gulton joint ventures. Rothberg and David were aware from the inception of the joint ventures that their conduct was illegal and took affirmative steps to conceal the illegality through the structure of the joint venture, the use of oral guarantees, the concealment of Selzer's role in the deals, and the use of Sanford as a straw for David.

49. As the instigator and the financier of the joint ventures, Rothberg's culpable conduct fairly outweighs that of David and Sanford. Rothberg aggressively supported the illegal ventures to trade on inside information, and his participation was active, willing, and complete. In effect, Rothberg and David were co-conspirators to violate the securities laws against insider trading.

50. Rothberg testified that he filed this suit more than thirteen years after the Joint Venture Agreements were executed because he hoped to benefit from the inheritance which David and Sanford received after the death of their parents. N.T. 2.37–39.

51. However, Rothberg's "forebearance" from pressing the Rosenblooms to repay their debt to him stemmed from Rothberg's concern about the possibility of prosecution brought by the Securities Exchange Commission (S.E.C.). Rothberg had been the target of an S.E.C. investigation in 1971 for his alleged receipt of and use of inside information concerning proposed mergers of an entity known as Harvey's Stores, of which David was then an executive. N.T. 1.175–83.

52. Barring Rothberg from recovery here would enhance, not interfere with, the effective enforcement of the securities laws and would more likely protect the investing public than enforcing these con-

tracts, spawned from greed and nurtured by crooked insider dealing.

53. Permitting the parties to stand where the market has left them serves to deter others from organizing and financing ventures to trade on inside information.

54. As I noted in my Bench Opinion, Rothberg is an astute, sophisticated and intelligent businessman, careful about detail. N.T. 3.126. David, on the other hand, was a voluble, limited person, unlikely to keep business secrets and insensitive to the requirements of law regarding the fiduciary duties and legal restrictions imposed on him as a corporate insider responsible for the money of the investing public. The unfortunate combination of Rothberg's greed and independence in attending to details of his affairs and David's carelessness about his legal obligations leads me to believe that David Rosenbloom furnished plaintiff the inside tips which were the basis for the investment decisions of these joint ventures. I cannot believe that Benjamin Rothberg, as he contended, would turn over his business decisions to David Rosenbloom. N.T. 3.126–27.

## DISCUSSION

### The Illegality Defense

Rothberg argues that the defense of illegality is unavailable to the Rosenblooms under Pennsylvania law. Rothberg cites authority to the effect that a court will enforce a claim based on an illegal contract if the *plaintiff* can make out his claim without reference to the illegal underlying transaction. *See e.g., O'Brien v. O'Brien Steel Construction Co.,* 440 Pa. 375, 380, 271 A.2d 254, 256 (1970); *New York & Pennsylvania Co. v. Cunard Coal Co.,* 286 Pa. 72, 132 A. 828 (1926); *Holt v. Green,* 73 Pa. 198, 200–01 (1873); *Contractor Industries v. Zerr,* 241 Pa.Super. 92, 97, 359 A.2d 803, 805 (1976).

Rothberg claims that he has brought suit on facially valid negotiable instruments and that the defendants have never questioned the authenticity of the notes and guaranty.[5] Therefore, he claims he has made out his case as Pennsylvania law requires, without reference to the underlying illegal contract.

Rothberg, however, ignores a line of Pennsylvania authority holding that courts will look at the *substance,* not the mere form of the transactions. *See e.g. New York & Pennsylvania Co. v. Cunard Coal Co.,* 286 Pa. 72, 84, 132 A. 828, 832 (1926); *Kuhn v. Buhl,* 251 Pa. 348, 373, 96 A. 977, 985 (1916); *Irvin v. Irvin,* 169 Pa. 529, 32 A. 445 (1895). *Accord Tucker v. Binenstock,* 310 Pa. 254, 165 A. 247 (1933). Even where a plaintiff can prove his case without reference to an underlying illegal transaction, a court will not enforce such a

---

5. The fact that the notes and guarantee are facially valid and are under seal does not free them from a defense of illegality. As I noted in my bench opinion, the Rosenblooms did not and could not waive such a defense. It would be against public policy for them to do so. Since I have found that Rothberg was aware of the illegal insider trading undertaken by the Mallory Randall and Gulton joint ventures, he is not a holder in due course. A holder in due course must take a note without notice of any defense against it or claim to it on the part of any person. 12A P.S. section 3–302(1)(c). As a participant in the plan to trade on inside information, Rothberg was on notice of the defense of illegality. *See id.* section 1–201(25). Because Rothberg lacks the status of a holder in due course, he takes subject to "all defenses of any party which would be available in an action on a simple contract." *Id.* section 3–306(b).

Rothberg also claims that he has given separate and independent consideration in exchange for the notes and guarantee through his voluntary forebearance from collecting on the debt prior to this suit and because he reduced the rate of interest to be assessed. For these reasons, he argues, the notes are so far removed from the underlying illegal transactions that they are free from any taint. Voluntary forebearance from collecting on an unenforceable contract does not constitute the kind of separate and independent consideration that Pennsylvania law requires to free an illegal contract from the taint of a prior illegality. *See, e.g., Armstrong v. Toler,* 24 U.S. (11 Wheat.) 258, 6 L.Ed. 468 (1826); *Kuhn v. Buhl,* 251 Pa. 348, 96 A. 977 (1916); *Morris Run Coal Co. v. Barclay Coal Co.,* 68 Pa. 173 (1871); *Seidenbender v. Charles,* 4 Serg & Rawle 151 (1818). Moreover, I find that Rothberg did not attempt to collect on the debt in order to allow the statute of limitations to run on the federal securities violations committed by the Gulton and Mallory Randall joint ventures.

contract where to do so would offend public policy. The "scope of the public policy doctrine is broader and more encompassing than the concept of illegality." *Shadis v. Beal,* 685 F.2d 824, 833 (3d Cir.1982), *cert. denied,* 459 U.S. 970, 103 S.Ct. 300, 74 L.Ed.2d 282 (1982).

■ In this case, I find that the Gulton and Mallory Randall joint ventures, which sustained the losses that are the basis of the notes and guarantee in question, were part of a plan between Rothberg and David to violate federal securities laws. To enforce this agreement would violate the purpose of these laws, which is to protect the investing public. Under these circumstances, Pennsylvania law tells me to leave the parties where the market has left them:

"What results to a contract against public policy is a total and irremediable paralysis, which leaves it absolutely without any force or effect whatever, so that it cannot, under any circumstances, be made the basis of a cause of action. The law when appealed to will have nothing to do with it, but will leave the parties just in the condition in which it finds them. If they have fully executed their unlawful contract, the law will not disturb them in the possession of what each has acquired under it. If one has executed in whole or in part, the law turns a deaf ear when he pleads for its aid to compel the other to do as much.... If the contract is still executory, the promissor is left undisturbed in the possession of the money or other property which he agreed to pay or transfer; if the contract has been executed, the promissee is left undisturbed in the possession of the money or other property which has been paid or conveyed to him." *Pittsburg v. Goshorn,* 230 Pa. 212, 227, 79 A. 505, 510 (1911); *Dippel v. Brunozzi,* 365 Pa. 264, 267–68, 74 A.2d 112, 114 (1950).

■ Regarding the defense of *in pari delicto* under Pennsylvania law, Rothberg contends that Sanford was "neither 'in pari' nor 'delecto.'" Plaintiff's Memorandum of Law at 8. Plaintiff's argument is a play on words. As Judge Spaeth noted,

the doctrine of *in pari delicto* is a specific and limited application of the general principle that " 'no court will lend its aid to a man who grounds his action upon an immoral or illegal act.' " *Feld & Sons v. Pechner, Dorfman, Wolfee, et al.,* 312 Pa. Super. 125, 130, 458 A.2d 545, 548 (1983), *appeal dismissed,* 504 Pa. 177, 470 A.2d 525 (1984) (quoting *Fowler v. Scully,* 72 Pa. 456, 467 (1872)). Courts refuse to enforce illegal contracts or contracts made in violation of public policy to make sure that the law does now allow a wrongdoer to recover. The defense of illegality is "allowed not for the sake of the defendant, but of the law itself." *Fowler v. Scully,* 72 Pa. at 466; *Fitzsimons v. Eagle Brewing Co.,* 107 F.2d 712, 713 (3d Cir.1939) (the court's refusal to enforce a contract in violation of public policy is not for the sake of the defendant, but to avoid aiding such a plaintiff.); *F.F. Bollinger Co. v. Widmann Brewing Corp.,* 339 Pa. 289, 295, 14 A.2d 81, 84 (1940) (the rule preventing recovery on an illegal contract is founded on public policy, not through regard for the person who sets up such a defense.).

*The "Bateman Eichler" Decision*

The Third Circuit remanded this case to me to apply the *in pari delicto* defense that the Supreme Court formulated in *Bateman Eichler, Hill Richards, Inc. v. Carl F. Berner, et al.,* —— U.S. ——, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985), issued after my Bench Opinion in this case. In *Bateman Eichler,* a group of investors who had sustained substantial trading losses instituted a private cause of action for fraud under Section 10(b) of the Securities Exchange Act of 1934 against a securities broker and a corporate insider. The investors claimed that the broker and corporate officer had fraudulently induced them to purchase large quantities of stock in the company of the corporate officer by divulging false information about the company. The investors admitted that their purpose in purchasing the stock was to earn secret profits on inside information. The defend-

ants contended that the doctrine of *in pari delicto* barred the investors' action.

■ The Court rejected the arguments of the defendants, severely restricting the availability of the *in pari delicto* defense in private damage actions under the federal securities laws. Henceforth, the defense would be appropriate "only where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public." *Bateman Eichler*, 105 S.Ct. at 2629.

The first part of the test requires weighing the relative culpability of the parties. In *Bateman Eichler*, the Court noted that the broker and corporate officer (tipsters) had violated their fiduciary duties by disclosing inside information to the plaintiff investors (tippees). The breach of duty by the plaintiff-investors derived from the breach of their tipsters, the broker and corporate officer. The Court reasoned that in the context of insider trading, a person whose liability is solely derivative could not be as culpable as one whose breach of duty gave rise to that liability in the first place. *Id.* at 2630. Thus, absent other culpable acts on the part of the tippees, as a matter of law, the actions of tippees were not of substantially equal culpability as those of their tipsters. *Id.* at 2630–31.

The second part of the test requires that a court assess the effect of allowing the defense of *in pari delicto* on the enforcement of the securities laws and on protecting the investing public. In *Bateman Eichler*, the Court noted that allowing the defendants to raise the defense "would inexorably result in a number of alleged fraudulent practices going undetected by the authorities and unremedied." *Id.* at 2631. In addition, the Court reasoned that "deterrence of insider trading most frequently will be maximized by bringing enforcement pressures to bear on the sources of such information—corporate insiders and broker-dealers." *Id.* at 2632. The Court, thus, viewed the insider-tipster as the source of the information and of the problem. Deterrent pressures, therefore, would be placed on the tipster by limiting application of *in pari delicto*.

Prior to *Bateman Eichler*, the Third Circuit in *Tarasi v. Pittsburgh National Bank*, 555 F.2d 1152 (3d Cir.1977), *cert. denied*, 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 451 (1977), as well as other courts, had reasoned that without the *in pari delicto* defense, tippees would have an enforceable warranty to trade on inside information: If the tip were correct, the tippees would reap illicit secret profits; if the tip did not yield the expected results, the tippees could sue their tipsters to recover damages. The *Bateman Eichler* Court rejected the enforceable warranty theory because it "overlooks significant factors that serve to deter tippee trading irrespective of whether the *in pari delicto* defense is allowed." *Id.*, 105 S.Ct. at 2633. The Court noted that tippees who bring suit to cash in on their enforceable warranties expose themselves to civil and criminal penalties for their own illegal conduct. *Id.* In addition, actions brought under section 10(b) and Rule 10(b)–5 require plaintiffs to prove *scienter* on the part of their defendants. For this reason, tippee-investor plaintiffs will only be able to recover from tipster-defendants where the tipsters have deliberately defrauded their tippees. Such plaintiffs will not be able to bring suit merely if the tip fails to pan out. *Id.*

■ Although *Bateman Eichler* limits the application of the *in pari delicto* defense, it does not eliminate it totally. The Court recognized that "situations might well arise in which the relative culpabilities of the tippee and his insider source merit a different mix of deterrent incentives" from those in *Bateman Eichler*. 105 S.Ct. at 2632. I find that this matter contains such a mix of deterrent incentives to make application of *in pari delicto* appropriate.[6]

---

6. This case, unlike *In re Olympia Brewing Company Securities Litigation*, No. 77 C 1206 (N.D.

With regard to the relative culpability of the parties, the facts of this case do not resemble those in *Bateman Eichler*. Here there is no corporate officer or broker inducing a passive and innocent person to invest on the basis of inside information. Rather, Rothberg's participation in the six joint ventures to trade on inside information (for which he advanced over $1,365,-000) was active and aggressive; it was not after-the-fact participation in an insider's breach of duty. David's testimony reveals that it was Rothberg who pressured David to come up with a way for Rothberg to earn more money on his investments. That request led to the formation of the joint ventures to trade on inside information to earn secret profits.[7]

Ill. Nov. 18, 1985), involves Rothberg's misconduct in knowingly financing the two illegal ventures at issue, which were at the core of the violation of securities laws which defendants are raising. Further, the considerations in promoting the purposes of securities law protections are totally different in this case from the situation in *Olympia Brewing*.

7. In response to the questions of counsel, David testified as follows:

Q. Well, in any event, did there come a time when you and Mr. Rothberg entered into a joint venture agreement concerning securities of Harsco Corporation and your brother and Mr. Rothberg entered into a joint venture agreement with respect to securities of Nytronics?

A. Yes, there came a time.

Q. Now would you tell his Honor how it came about that those joint ventures were entered into?

A. Mr. Rothberg had been very instrumental in helping put the Nytronics syndication through and he felt that he wanted to make more money. He had invested a lot of his money in tax-free securities, some of which perhaps he had sold at a loss, most of which had depreciated in value due to the rising interest rate. *He was concerned to make up that loss, specifically and generally to make money,* and he asked me and then I discussed the matter with Benson as to how we could make him some money and at the same time perhaps make ourselves some money.

Q. All right. Now, when—

A. He felt that I was getting a salary.

Q. When you say he felt, he thought, was this something that you just surmised from looking at him or did you have discussions?

A. *He said something about he had lost a lot of money in tax-frees or some money in tax-frees, due to the rise in interest rates and some he had*

With the exception of the $100 in cash that Sanford contributed to the Mallory Randall and Gulton joint ventures, it was Rothberg's loans that fueled the activities of the ventures. His money was the *sine qua non* of the insider trading scheme. Moreover, Rothberg's ability to extract indemnities against loss shows his superior bargaining power to David's: Sanford guaranteed Rothberg and David guaranteed Sanford's guarantee.

In short, Rothberg was the instigator and financier of the scheme to trade on insider information. Rothberg was a rich and powerful financier; David was a weak and dependent tout. Rothberg called the tune; David danced. As I noted in my bench opinion:

*sold, some he had kept, but he wanted to continue to make money, but he didn't want a job, and he felt that perhaps we owed him something. In fact, we did owe him something in putting—in helping to put across the Nytronics syndication*
. . . .

BY MR. MONTEVERDE:

Q. What did you and Mr. Selzer do after Mr. Rothberg expressed these sentiments?

A. We talked about it a lot; we thought about it a lot. We talked about it again, thought about it again. There just didn't seem to be any way. We were always looking at companies to buy. It's very difficult to buy a company, especially when you don't have any money, and Mr. Selzer didn't have any money, I didn't have any money, and it just didn't seem to be any way of doing it. *However, Mr. Selzer came up with an idea, which he explored first along with me, on allowing Mr. Rothberg to participate through inside information in two deals in which he would not participate and one in which I would not participate. That would be a way to make Rothberg some money and at the same time make some money for ourselves.*

Q. *Well, did you discuss this with Mr. Rothberg?*

A. *Yes, we discussed it with Mr. Rothberg on more than one occasion.*

Q. And what did he say when you proposed this to him?

A. *Ultimately he agreed, provided*—I felt he did not know Mr. Selzer well. The information was really inside and *that he'd be guaranteed against any loss by me* and he advised me to be guaranteed against any loss by Mr. Selzer.
N.T. 3.53–56 (emphasis added); *see also* N.T. 3.60–61, 3.62–63.

"Mr. Rothberg, from my observing his testimony, is an astute, sophisticated and intelligent businessman, extremely careful about detail. David Rosenbloom, from my observing his testimony, is a voluble, limited person, unlikely to keep business secrets and insensitive to the basic requirements of law regarding the fiduciary duties and legal restrictions imposed upon him as a corporate insider responsible for public investors' money. The combination of Mr. Rothberg's care and interest about the details of his affairs and Mr. Rosenbloom's carelessness about his legal obligations leads me to believe that David Rosenbloom told plaintiff the inside tips which were the basis for the investment decisions of the two joint ventures. I cannot believe that Mr. Rothberg would turn over his investment decisions to a David Rosenbloom." N.T. 3.126–27.

I find that Rothberg's culpable financing of these illegal schemes can fairly be said to outweigh David's weakness in furnishing tips. *See Bateman Eichler*, 105 S.Ct. at 2630–31.

I also find that precluding this claim would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public. Unlike *Bateman Eichler*, barring this suit would not result in denying a defrauded tippee an incentive to bring a tipper's misdeeds to light. Rather, it is the defendants here raising the fraudulent practices which would otherwise go undetected and unremedied. To encourage bringing illegal insider trading to light, at least in this case, means allowing the defendants, who borrowed money to participate in illegal ventures, to blow the whistle on their lendor, who shared illegal profits in this series of ventures trading on inside information.

Moreover, deterrent pressures in this case are probably stronger on the well-advised financier than on the marginal insider

risk-taker. That is, denying recovery to a sophisticated lendor like Rothberg will probably discourage insider trading by cutting off the transaction at its root, money. If Rothberg does not get his money back in this case, he and others like him will be less likely to do it again. Such additional deterrence is necessary, particularly in this case, because Rothberg waited so long to bring his action in order to avoid prosecution by the Securities and Exchange Commission. The parties here got a taste of S.E.C. enforcement efforts in the early 1970's. *See, S.E.C. v. Shapiro*, 349 F.Supp. 46 (S.D.N.Y.1972), *aff'd*, 494 F.2d 1301 (2d Cir.1974).

The insider touts of the world are less likely to be emboldened to sell tips if I let them off the creditor's hook than the insecure financiers of illegal ventures (demanding protection by notes against losses and guarantees of guarantees) are likely to be deterred by my denying their recovery.

One of the bases on which the Supreme Court rejected the "enforceable warranty" theory of the Third Circuit in *Tarasi* was because of the possibility of civil and criminal prosecution of a plaintiff who tries to enforce such a warranty under the federal securities law. *Bateman Eichler*, 105 S.Ct. at 2633. In this case, however, the statute of limitations for Rothberg's civil and criminal liability under federal securities laws has run.[8]

With regard to the enforceable warranty theory, I doubt that the David Rosenblooms of the world would be encouraged to borrow money for insider trading if they had a "warranty" that they did not have to pay back their lendors. Such a concern goes too far, like the warranty theory rejected in *Bateman Eichler*. First, insiders who borrow to trade expose themselves to substantial civil and criminal liability. Second, only lendors who knowingly finance illegal ventures in which they participate, like Rothberg, would be barred from recovering. Finally, what drives insider trading

---

**8.** The Court's other basis for rejecting the enforceable warranty theory is also inapposite here. The Court noted that actions under section 10(b) and Rule 10b–5 require a plaintiff to prove *scienter* on the part of the defendant. *Id.* But Rothberg has brought a contract action to enforce two notes and a guarantee: *scienter* is not an essential element of his case.

is the expectation of profit, not the hope or expectation of avoiding repayment of a debt where even the factual basis for such a defense is uncertain at the time of trading. The David Rosenblooms of the world will probably make their decisions whether or not to engage in insider trading without considering their chance to escape liability for repayment of the debt that finances the trading. The future financiers—allergic to risk—will more likely benefit from advance advice by informed counsel of the risks of financing illegal insider trading schemes than will the future irresponsible insiders of public issuers of volatile securities, who seek to profit from their position.

The Supreme Court concluded in *Bateman Eichler* "that the public interest will most frequently be advanced if defrauded tippees are permitted to bring suit and to expose illegal practices by corporate insiders ... to full public view for appropriate sanctions." 105 S.Ct. at 2633. My conclusion in this case is that the public interest will best be served if the little fish are permitted to defend litigation by the big fish who finance illegal joint ventures to trade on insider information. This view more likely will bring to light for appropriate sanctions the wrongdoing of financiers who profit from the weakness of others. Allowing Rothberg to recover would frustrate the purposes of the securities laws by rewarding well-structured greed. Denying Rothberg recovery effectuates the laws against insider trading by putting its financiers at risk.

## JUDGMENT

AND NOW, this 14th day of February, 1986, judgment is entered in favor of defendants and against plaintiff for the reasons stated in the foregoing Memorandum.