**Samuel PELTZ, Appellant,**

v.

**SHB COMMODITIES, INC., Isaac Mayer, Solomon Mayer, and Bezalel Mayer, Appellees.**

**No. 96–7401.**

United States Court of Appeals, Second Circuit.

Argued Jan. 7, 1997.

Decided May 15, 1997.

---

Daniel V. Gsovski, Herzfeld & Rubin, New York City, for Appellant.

Martin H. Kaplan, Grusae, Kaplan & Bruno, New York City (Melvyn J. Falis and John E. Bersin, of counsel), for Appellees.

Before: NEWMAN, Chief Judge, FEINBERG and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge:

## BACKGROUND

### A. *The Players*

Samuel Peltz is an investor in commodities. Commodities, unlike stocks, comprise various items such as agricultural products, metals or energy. Investors purchase commodities "contracts," which represent a specific amount of the commodity. One of the principal markets where investors trade commodities contracts is the Commodities Exchange ("COMEX") in New York.

SHB Commodities, Inc. is a registered "futures commission merchant" ("FCM"), a firm authorized to deal on the COMEX. It is owned by defendants Solomon ("Shlomo") and Bezalel ("Buzzy") Mayer. As a "futures commission merchant," SHB solicits or accepts orders to buy or sell commodities for future delivery; in that regard, SHB accepts money or extends credit to margin, to guarantee or to secure any resulting trades. *See* 7 U.S.C. § 6. Peltz maintained an account at SHB through which he negotiated commodity trades.

Ludwig ("Leo") Weingarten, although not a party to this litigation, occupies center stage. Weingarten was a "floor broker" on the COMEX, i.e., one who literally stands on the floor of the COMEX, and does the work of buying and selling the commodities. He was never employed by SHB.

### B. *The Play*

On March 23, 1989, in the morning hours before the COMEX opened, Peltz and Weingarten met for coffee in Lord's Coffee Shop in lower Manhattan. Apparently, the two had never had prior business dealings. Despite their unfamiliarity, Peltz agreed to let Weingarten sell copper futures contracts

from the floor of the COMEX that morning against Peltz's account at SHB. Peltz never gave Weingarten written authority to make trades against or otherwise control his account, and SHB never received any written authorization.

Weingarten and Peltz also agreed to "short sell" copper futures contracts, i.e., to sell contracts that one does not yet own. One who sells such a phantom contract is said to be in a "short position." The short seller gambles that the market will decline and he thus expects to purchase a contract sometime in the future at a price lower than that at which he sold it. This will "cover" his short position, and he will realize a profit.

The profit potential is very high. There is, of course, the unhappy possibility that the price of copper will rise, resulting in serious economic loss. Weingarten testified that he and Peltz conspired to short sell copper contracts, and, to ensure a profit, also conspired to then depress the copper market with high volume offers to sell contracts. Once the price was depressed, Peltz was to buy these artificially reduced-price contracts to cover the short position created by Weingarten, and realize a great profit.

The two conspirators disagree as to how much authority Peltz gave Weingarten. Peltz says that the coffee shop agreement was that Weingarten would trade 500 contracts at prices no lower than $135.50. Peltz adds that he made clear that his position was to be "flat" at the end of the trading day (i.e., the short position was to be fully covered). Weingarten's version, on the other hand, was that Peltz gave him unfettered discretion to make whatever trades he thought would be profitable.

After the kaffeeklatsch, Peltz repaired to the SHB offices, and Weingarten to the copper pit on the floor of the COMEX. Peltz took a chair next to SHB's order clerk, in front of the commodities ticker, where he could observe the day's trade in commodities. During the morning, Weingarten phoned SHB and an employee named Eis answered. Weingarten explained that he would be "doing paper" for Peltz that day, to which Eis responded "okay." As soon as the copper futures market opened, Weingarten began to sell huge amounts of copper contracts.

Throughout the fateful day, Peltz and Weingarten kept in telephonic contact. SHB recorded these conversations. While it is difficult to discern the precise conversations, it is clear that Peltz knew that Weingarten was selling more than 500 contracts, and was doing it at prices lower than $135.50. Indeed, just minutes after the market opened, Weingarten was selling copper contracts at $135.20 and $135.30. Peltz maintained a tally sheet throughout the trading day and he noted that at 10:02 AM most of Weingarten's trades were at prices below $135.50, and that by 10:55 AM Weingarten had already sold over 1000 contracts.

Weingarten, from the trading floor, repeatedly warned Peltz to start buying contracts to cover the mushrooming short position. In the middle of the trading day, the situation began to turn sour. A jittery Peltz warned Weingarten to "be careful" because people on the floor were beginning to realize that "things ... [were] not normal." At 11:40 AM the two spoke. Weingarten said that he "sold twelve—fourteen hundred" contracts. Peltz responded that he bought only 675. Back and forth calls continued in this vein. The numbers were not adding up.

It was apparent by mid-afternoon that the short-selling plan was going awry. Weingarten told Peltz that COMEX officials threatened to remove him from the floor unless Weingarten could maintain $50,000 in his own personal trading account. Peltz immediately wrote Weingarten a personal check, keeping Weingarten on the trading floor, and breathing new life into the scheme.

At 2:30 PM, Buzzy Mayer, SHB's co-owner, first learned that SHB had acted as clearing agent for a significant amount of copper contracts. He also found out that Weingarten was the seller, and that the sales were against Peltz's account. Mayer went looking for Weingarten, who told Mayer that he had been selling all day for Peltz, and was now a few contracts short.

At 3:45 PM, COMEX officials summoned a representative of SHB to inform the company that, as the clearing member of the ex-

change involved in all these sales, it now faced a margin call for the short-selling of copper futures contracts. At 4:48 PM, Mayer called Peltz and asked him to describe the agreement with Weingarten. Peltz stated that he had agreed to only 500 or 600 contracts, but he would accept more from Weingarten so long as Peltz's position remained "flat" for the day.

By day's end, Weingarten had sold a total of 2667 contracts against Peltz's SHB account. Peltz, for his part, placed buy orders through SHB for 1165 contracts. In sum, Peltz failed to purchase the more than 1500 contracts necessary to cover fully the short position Weingarten had created.

Shortly after realizing that he had not fully covered his short position, Peltz telephoned SHB to protest that Weingarten had no authority to make trades against Peltz's account; and he disclaimed the short sales for which he had not purchased offsetting contracts. At 5:00 PM, SHB tried to disavow formally, or "dk" (literally, "doesn't know"), the trades with COMEX. COMEX officials rejected this effort.

C. *Denouement*

The next day the COMEX was closed for Good Friday. Weingarten testified that on Saturday Peltz called, first to threaten him, and then to bribe him. Weingarten testified that Peltz offered "to take care of him" if Weingarten would just say he went "crazy." The following Monday, SHB officials issued a margin call of over $3 million against Peltz's account at SHB. Peltz could not meet the call, forcing SHB to purchase the contracts. The net result was a charge to Peltz's account of $1,332,054.72.

Peltz sued SHB, the Mayer brothers and Weingarten, but soon dropped the suit against Weingarten. Peltz asserted claims against SHB and the Mayers for various violations of the Commodities Exchange Act ("CEA") and New York common law, claiming that SHB was liable for the loss incurred when it purchased the copper contracts to cover Peltz's short position. The theory driving Peltz's case was that SHB was responsible for the short position Weingarten created because, under 17 C.F.R. § 166.2,

SHB should have received from Peltz either written or "specific" authorization for the sales. Peltz argued that SHB wrongfully cleared Weingarten's trades, thereby defrauding Peltz.

Peltz claimed that SHB was liable under § 4b of the CEA for willfully deceiving him regarding the disposition of an order. *See* 7 U.S.C. § 6(b). Peltz also alleged that SHB criminally intended to convert Peltz's money, and wilfully induced the commission of a violation of CEA regulations. *See* 7 U.S.C. § 1 *et seq.* Peltz added state law claims for breach of fiduciary duty, breach of contract, and fraud.

After a nine-day bench trial, the district court rejected Peltz's claims, concluding that Peltz had lied when he said he limited Weingarten's authority to make only 500 sales at prices exceeding $135.50. The court rejected Peltz's federal claims, finding that Peltz failed to show that SHB intended to defraud Peltz.

The district court also rebuffed Peltz's fraud, contract, and fiduciary duty claims, reasoning that there was no intent to deceive, and that Peltz failed to show the breach of any duty arising out of the relationship or the contract between himself and SHB. Any losses, the district court concluded, were caused by Peltz and Weingarten's ill-conceived scheme to manipulate the copper markets. "To allow Peltz to reject certain transactions undertaken by his independent, rogue-FCM [Weingarten] only after Peltz concluded that the transactions would be unprofitable," the district court wrote, "would be to offer [Peltz] a 'no risk, win-win, situation.'"

Peltz appeals, arguing that SHB is responsible for the margin call because, under 17 C.F.R. § 166.2, SHB never had proper authorization from Peltz to accept Weingarten's trades against Peltz's accounts. The central question on this appeal is whether SHB had sufficient authority to clear Weingarten's trades against Peltz's account.

## DISCUSSION

I. *The Authority of a Customer's Third–Party Designee*

Section 4b(A) of the CEA makes it unlawful for SHB to make trades against a custom-

er's account without the customer's permission. 7 U.S.C. § 6(b). Peltz concludes that he is not responsible for the margin call SHB charged to his account because SHB failed to get permission under 17 C.F.R. § 166.2 before SHB cleared Weingarten's trades. This failure, Peltz contends, shifts liability exclusively to SHB. SHB responds that Weingarten had sufficient authority to make the trades, and therefore, Peltz must pay the debit to his account.

Rule 166.2 was promulgated under the CEA, and states that

> [n]o futures commission merchant, introducing broker or any of their associated persons may directly or indirectly effect a transaction in a commodity interest for the account of any customer unless before the transaction the customer, or person designated by the customer to control the account—(a) Specifically authorized the futures commission merchant, introducing broker or any of their associated persons to effect the transaction (a transaction is "specifically authorized" if the customer or person designated by the customer to control the account specifies (1) the precise commodity interest to be purchased or sold and (2) the exact amount of the commodity interest to be purchased or sold); or (b) Authorized in writing the futures commission merchant ... to effect transactions in commodity interests for the account without the customer's specific authorization.

17 C.F.R. § 166.2. In sum, an FCM may execute trades for a customer only after the customer or someone designated by the customer to control the account "specifically authorize[s]" the trades under § 166.2(a), or provides the FCM with written authorization for the trades under § 166.2(b).

■ It is clear from the rather straightforward language of the regulation that an FCM needs *written* authorization to make trades only when the FCM has not received "specific[ ] authoriz[ation]" for the transaction. *See* 17 C.F.R. § 166.2(b). Under the regulation, only two persons can give such "specific[ ] authoriz[ation]"—the customer

himself, or the "person designated by the customer to control the account." 17 C.F.R. § 166.2. Peltz adds a requirement, appearing nowhere in the Rule, that the designation of a person to control the account must be by a written power of attorney. From this Peltz reasons that because he did not execute such written power of attorney, and did not authorize the trades in writing under 166.2(b), SHB should not have made the trades. Peltz's interpretation of the regulation does not bear scrutiny.

■ Everyone agrees that Peltz did not give SHB a written authorization to make the trades, nor a written power of attorney allowing Weingarten to make trades on his behalf. While lack of written authorization for SHB to make the trades means that SHB could not execute the transactions under 166.2(*b*), the lack of a written power of attorney designating Weingarten to control the account does not rule out the possibility that SHB had "specific[ ] authoriz[ation]" from the customer's designee to accept the orders under § 166.2(*a*). Nothing in the regulation or in the caselaw interpreting subdivision (a) requires that, before an FCM makes trades specifically authorized by a designee, the FCM has to get written authorization from a customer appointing the designee. While written authorization may help an FCM to determine whether an individual is indeed a person designated by a customer to control the account, it is not a legal necessity.

Peltz argues that this lax interpretation runs contrary to that announced by the Commodity Futures Trading Commission[1], the entity responsible for policing the COMEX and those who trade in futures, in *Matter of Heitschmidt*. *See Matter of Heitschmidt*, [1994–1996 Transfer Binder] Comm. Fut.L.Rep. (CCH) ¶ 26,263 at 42,204 (CFTC Nov. 9, 1994). In *Heitschmidt*, the CFTC announced that

> [a] liability analysis under Commission Rule 166.2 focuses on two issues: (1) whether there was a written power of attorney in effect at the time of the transaction at issue and, if not, (2) whether the

---

1. After oral argument, the panel solicited the Commodity Futures Trading Commission's ("CFTC") understanding of 17 C.F.R. § 166.2.

The CFTC filed a brief as a friend of the court, and this panel's views accord with the CFTC's position.

transaction was specifically authorized by the customer in advance of its execution. *See Wolken v. Refco, Inc.*, [1987–1990 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 24,509 at 36,188 (CFTC July 18, 1989). Under Rule 166.2, a customer's oral grant of general discretion to an account executive is irrelevant to the analysis of liability because the rule renders such agreements void.

*Id.* Peltz concludes from this statement that "a broker accepting trades from a person other than the customer without written authorization commits a *prima facie* violation of the [CEA]." Appellant's Brief at p. 29. Peltz misinterprets *Heitschmidt*.

*Heitschmidt* involved unauthorized trading by an "associated person" ("AP") (a person associated with an FCM) of both discretionary and non-discretionary accounts. The CFTC found that the AP's trades against the discretionary account violated Rule 166.2 because, despite the customer's oral revocation of written authorization it had sent the AP to make the trades under 166.2(b), the AP made trades without consulting the customer. ¶ 26,263 at 42,205. As to the nondiscretionary accounts, the Commission found that the AP had made trades beyond the customer's general instructions.

*Heitschmidt* thus stands for the unexceptional proposition that an FCM or AP must have written authorization to make trades against a customer's account when those trades are not specifically authorized by the customer or one designated by the customer to control the account. Peltz confuses the role the AP played in *Heitschmidt* with the role played by Weingarten in the coffee shop scheme. The AP, like an FCM, had to follow the instructions of a customer or one designated by the customer to control an account. These instructions had to come in one of two forms: (1) a specific authorization under 166.2(a); or (2) a written authorization under 166.2(b). The *Heitschmidt* AP failed to get written or specific authorization for the trades he made, thus making him liable.

Weingarten, on the other hand, was acting as a designee, not an AP or an FCM. Under the regulation and *Heitschmidt*, all SHB needed before clearing the trades was either "written" or "specific" authorization from the customer, Peltz, or the customer's designee. It did not, however, need a written authorization from Peltz giving Weingarten a power of attorney over the account. The only question for us now is, in the absence of a written power of attorney from Peltz appointing Weingarten as his designee, what type of proof will suffice, for purposes of exonerating SHB, to show that Weingarten was in fact the designee, authorized to order trades against Peltz's account?

■ There is no question that an FCM may make trades ordered by someone other than the customer himself when that someone is designated by the customer to control the customer's account. *See* 17 C.F.R. § 166.2. The FCM may make trades ordered by the third party who has either actual or apparent authority to make the trades. *See Sansom Refining Co. v. Drexel Burnham Lambert, Inc.*, [1986–1987 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 23,-796 at 34,107 (CFTC July 20, 1987), *aff'd in part, rev'd in part and remanded sub nom. Drexel Burnham Lambert Inc. v. CFTC*, 850 F.2d 742 (D.C.Cir.1988).

■ Generally, before accepting trades from a third party, the FCM must make a reasonable inquiry into the nature and extent of the individual's authority. *See id.* ¶ 23,796 at 34,108. Apparent authority exists "when a principal, either intentionally or by lack of ordinary care, induces [the FCM] to believe that an individual has been authorized to act on its behalf." *Id.* (citing *Wheeler v. Investment Managers Commodity Corp.*, [1984–1986 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 22,770 at 31,220 (CFTC Oct. 30, 1984)). Actual authority "is created by direct manifestations from the principal to the agent, and the extent of the agent's actual authority is interpreted in the light of all circumstances attending these manifestations, including the customs of business, the subject matter, any formal agreement between the parties, and the facts of which both parties are aware." *Demarco v. Edens*, 390 F.2d 836, 844 (2d Cir.1968).

■ It is not clear from the record that Weingarten had apparent authority to make

the trades. We cannot say that Peltz's statements and actions reasonably induced SHB to believe that Weingarten had the power to make the trades. However, we hold that the district court's factual findings support the conclusion that, at the coffee shop, Peltz granted Weingarten the actual authority to sell all the copper futures contracts in question.

Only two people know what transpired across the table at Lord's Coffee Shop on that ill-fated morning. Peltz maintained that he allowed Weingarten to sell only 500 contracts at $135.50 or better. Weingarten had a different version: that Peltz granted him absolute discretion to make the trades. The district court weighed the testimony, made credibility determinations, and found that the events of that morning did not support Peltz's version of the meeting.

Peltz admits that he granted Weingarten authority to make some trades. It was clear to the district court that Weingarten's authority was basically unfettered. From the first trades to the last conversation of the day between the conspirators, Peltz knew full well that Weingarten was selling far more than 500 contracts and at prices below $135.50. With every phone call, Peltz received instructions from Weingarten to cover the swelling short position. Peltz did nothing to stop Weingarten from trading. Furthermore, Peltz expressly told Buzzy Mayer that he was willing to accept more than 500 trades from Weingarten so long as his position remained "flat" for the day. The district court was not in error when it concluded, based on this abundant evidence, that Weingarten had the actual authority to make the trades in question.

■ In some cases, the next question would be whether SHB made a reasonable inquiry into the extent of Weingarten's authority, or merely acquiesced in Weingarten's representations that he had actual authority. We need not answer this question in this particular case. Where it is clear that the designee had *actual* authority from the customer, it would be superfluous (as a legal matter but, perhaps, not as a practical matter) to require an FCM to make an inquiry into the designee's authority.

■ In cases of *apparent* authority, it makes eminently good sense to require a reasonable inquiry before imposing liability on the principal. When an FCM relies on a defense of reasonable inquiry that revealed apparent authority, we accept the defense for two reasons: (1) to encourage the FCM to make a reasonable inquiry, thereby reducing the frequency of unauthorized trades; and (2) it is unjust to hold an FCM liable after it acted in a reasonably prudent fashion.

These policy matters do not concern us when there is actual authority. First—and most basically—when there is actual authority there is no unauthorized trade to avoid. Second, it is unsound and illogical to hold an FCM liable when its failure to perform a reasonable inquiry did not result in the acceptance of an unauthorized trade. Hence, we hold that courts need determine if there was a reasonable inquiry only when the question is whether the designee had apparent, rather than actual authority.

We hasten to add, lest FCM's become lackadaisical in their everyday duties, that as a practical matter FCM's should not gamble with the possibility that the designee has actual authority. A reasonable inquiry can never hurt. Admittedly, on some occasions it will be unnecessary because the inquiry reveals that a customer granted actual authority to the designee. However, there will be instances in which a designee has only apparent authority, and the only defense from liability for the FCM will be a reasonable inquiry.

It follows, therefore, that SHB is not liable for the margin call. SHB was specifically authorized to accept every trade made by Peltz's designated agent, Weingarten. Hence, SHB had proper authorization to complete Weingarten's transactions under 17 C.F.R. § 166.2(a).

## II. *The In Pari Delicto Defense*

Even if Peltz had not given Weingarten actual authority to make the trades, SHB should bear no responsibility for the margin call. Peltz was at least equally culpable with SHB for creating the short position. Thus, SHB is not liable because *in pari delicto*

*potior est conditio defendentis:* when there is mutual wrongdoing, the law favors the defending party. *See Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 306, 105 S.Ct. 2622, 2626–27, 86 L.Ed.2d 215 (1985).

The *in pari delicto* defense is used sparingly, and is narrowly defined in litigation under federal regulatory statutes. *See Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 145, 88 S.Ct. 1981, 1987–88, 20 L.Ed.2d 982 (1968) (not recognizing defense in antitrust action); *Ross v. Bolton,* 904 F.2d 819, 824 (2d Cir.1990) (recognizing defense in securities case). To ensure that the defense is narrowly applied in securities cases the Supreme Court in *Bateman Eichler, Hill Richards, Inc. v. Berner,* set forth a two-part test for the application of the defense in private causes of action under the securities law. *Bateman Eichler,* 472 U.S. at 310–11, 105 S.Ct. at 2628–29. The *Bateman Eichler* Court noted that the doctrine may bar an action "where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public." *Id.*

The first prong of the test sets forth the essential elements of the doctrine. *See Pinter v. Dahl,* 486 U.S. 622, 633, 108 S.Ct. 2063, 2071, 100 L.Ed.2d 658 (1988). Courts apply the defense where the plaintiff has participated in some of "the same sort of wrongdoing" as the defendant, *Bateman Eichler,* 472 U.S. at 307, 105 S.Ct. at 2627, and should not allow the defense "unless the degrees of fault are essentially indistinguishable or the plaintiff's responsibility is clearly greater." *Pinter,* 486 U.S. at 636, 108 S.Ct. at 2073. The second prong of the *Bateman Eichler* test instructs courts to consider the public policy implications of applying the defense.

Assuming SHB committed a wrong, Peltz's responsibility for creating the margin call is clearly greater. Under the CEA it is unlawful to attempt to manipulate or to manipulate the price of any commodity in interstate commerce. *See* 7 U.S.C. § 13b. As Weingarten testified, he and Peltz arranged to short sell copper contracts and then depress the price of copper contracts to reap a profit. The recorded telephone conversations between Peltz and Weingarten paint a clear picture of commodities price manipulation. The district court did not err when it concluded that the Peltz–Weingarten agreement was in violation of the CEA. Peltz's conduct thus falls within first prong of the *Bateman Eichler* test: his manipulation of the commodities market was far more reprehensible than SHB's violation of the regulations promulgated under the CEA.

Peltz seeks to evade the *in pari delicto* defense by noting that the wrongdoing of which he is accused (i.e., manipulating markets), is not the *same* wrongdoing he seeks to redress (i.e., SHB's clearing Weingarten's transactions through Peltz's account without proper authorization in violation of 17 C.F.R. § 166.2).

Peltz's hypertechnical interpretation of the *in pari delicto* doctrine is outdated. At one time this Court recognized that the *in pari delicto* defense was available only when the "fault of the parties [is] 'clearly mutual, simultaneous, and relatively equal,'" *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 76 n. 6 (2d Cir.1980) (citation omitted), and that mutuality of fault meant that the parties had to have a related purpose, or act as confederates. Our limitation of the defense reflected the general tenor set by the Supreme Court in *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), *modified, Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), which we, as many other courts, saw as a signpost "that the High Court had little enthusiasm for the *in pari delicto* defense." *Ross,* 904 F.2d at 825.

That message changed somewhat, however, when the Supreme Court decided *Bateman Eichler,* and we noted that change in tone when we decided *Ross v. Bolton. Id.* In *Ross,* the plaintiff agreed to purchase securities from R.E. Bolton & Co., Inc. ("Bolton") and resell the securities instantaneously at a higher, agreed upon price. *Id.* at

821–22. Defendant Bear Stearns & Co. ("Bear Stearns") acted as the clearing broker for the trades, but there was no evidence that it knew of the prearranged scheme. *Id.* at 820. When the plan did not work, Ross sued, among others, Bear Stearns, alleging that Bear Stearns fraudulently misled the plaintiffs into believing that Bolton was solvent. *Id.* at 822.

Ross declared that if he had known Bolton's true financial condition, he would not have involved himself in the scheme. We held that "because Ross intentionally entered into the prearranged trade with [Bolton], with its supposed guaranteed profit, he rather than Bear Stearns must bear the responsibility for the risks of the transaction." *Id.* at 825. The *in pari delicto* defense, we concluded, served as a complete bar to the plaintiff's suit against Bear Stearns.

*Ross* illustrates that we now recognize a broader notion of mutuality of fault, and, consequently, how Peltz's argument misses the mark. The alleged wrong committed by Bear Stearns in *Ross,* misleading the plaintiff into believing that Bolton was solvent, was qualitatively different from the wrong in which Ross participated—a prearranged stock parking scheme. Yet, that did not stop us from allowing Bear Stearns to bar Ross's suit through the application of the *in pari delicto* defense. So too, although the alleged violation of the CEA by SHB in this case is of a different quality than the market manipulation in which Peltz participated, the lack of an identical nature does not destroy the defense. We conclude therefore, that the first prong of the *Bateman Eichler* test is satisfied.

So too, the second prong of the *Bateman Eichler* test is satisfied: preclusion of Peltz's suit will not significantly interfere with the effective enforcement of the laws and protection of the public. *Au contraire,* allowing his suit would significantly interfere with the enforcement of statutes designed to protect the investing public. Assuming SHB did violate the regulations promulgated under the CEA, we would overlook that ministerial wrong when to do otherwise would protect a market manipulator without any benefit to the public.

Accordingly, both prongs of the *Bateman Eichler* test having been satisfied, we hold that Peltz cannot pursue his claims.

## CONCLUSION

We have considered all of Peltz's other arguments and consider them to be without merit. Accordingly, the judgment of the district court is affirmed.