SUNRISE FINANCIAL, INC., a Utah corporation, and UTCO Associates, Ltd., a Utah limited partnership, Plaintiffs,

v.

PAINEWEBBER, INC., a Delaware Corporation, Peter O. Bistrian, CKN Holding, Inc., Specialty Financing International, Inc., Pasquale A. Basile, Intercontinental Assets Corporation, and Joseph Steencken, Defendants.

No. 2:96 CV 0060 K.

United States District Court,
D. Utah,
Central Division.

May 6, 1998.

David R. King, David C. Wright, Kruse Landa & Maycock, Salt Lake City, UT, James N. Barber, Mooney Law Firm PC, Salt Lake City, UT, for Sunrise Financial, Inc., UTCO Associates.

Daniel M. Allred, Keith E. Taylor, Erik A. Christiansen, Parsons Behle & Latimer, Salt Lake City, UT, for Paine Webber Incorporated.

Peter O. Bistrian, West Chester, PA, pro se.

Sheila M. Reilly, Christopher A. Barber, Coffield Ungaretti & Harris, Chicago, IL, James S. Jardine, A. Robert Thorup, Ray Quinney & Nebeker, Salt Lake City, UT, Stephen O'Donnell, Chicago, IL, for Pasquale A. Basile.

David E. Leta, Matthew L. Lalli, Snell & Wilmer L.L.P., Salt Lake City, UT, Intercontinental Assets, c/o Dolores Passaretti, Las Vegas, NV, for Intercontinental Assets.

Intercontinental Assets, c/o Dolores Passaretti, Las Vegas, NV, pro se.

Joseph Steencken, Boca Raton, FL, pro se.

## MEMORANDUM DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING DEFENDANTS' CROSSMOTION FOR SUMMARY JUDGMENT

KIMBALL, District Judge.

This matter is before the Court on the motion for partial summary judgment of Plaintiffs Sunrise Financial, Inc. ("Sunrise Financial") and UTCO Associates, Ltd. ("UTCO") and the crossmotion for summary judgment of Defendant PaineWebber, Inc. ("PaineWebber"). Defendant Pasquale Basile joins in PaineWebber's crossmotion.

### I. BACKGROUND

The governing legal principles in this case are straightforward, and the essential facts upon which this Court's decision rests are few. However, the significance of those facts requires an understanding of a factual scenario that is long and complicated. This lawsuit arises in the aftermath of an unsuccessful attempt by Sunrise Financial and UTCO to sell two million shares of the stock of Vu–Data Corporation ("Vu–Data") to a group of buyers lead by Defendant Peter Bistrian. PaineWebber was to serve as an intermediary in that transaction.

### Phase 1: Formation of the Sunrise Group.

Sunrise Financial and UTCO did not own all of the two million shares of stock they attempted to sell. UTCO is the creation of Robert Kent, who serves as its general partner and uses UTCO to provide high risk, short term financing. Sunrise Financial was created by Leland Martineau to broker the same kind of high risk loans that UTCO financed, specifically, to find lenders for companies that were unable to meet the traditional collateral requirements of banks and other lending institutions. Sunrise Financial had brokered loans funded by UTCO on occasions prior to the events at issue. Kent was a former client of Martineau's accounting firm, and the two of them had engaged in various business transactions together over the preceding five years.

During the month of August 1994, Martineau was approached by Carl Martin, who told Martineau that John Worthen needed to borrow $100,000 and was willing to pledge 35,000 Vu–Data shares as collateral. Like Kent, Worthen and Martin were former clients of Martineau's accounting firm.

Martineau testified that he never asked Worthen how he acquired his Vu–Data shares or how he intended to repay the loan. Apparently, Worthen and his partner Robert Bryson received the stock as payment for their assistance in facilitating the merger of Vu–Data, which had been privately held, with a shell corporation with publicly-traded stock.

Sunrise Financial loaned Worthen the money, which UTCO provided. Pursuant to the terms of the agreement between Sunrise Financial and Worthen, the shares were to be surrendered for the amount of the loan if

Worthen failed to repay the debt. The 35,-000 shares, together with an additional 50,-000, would be held in escrow under conditions that ensured the loan would be fully secured at all times. Pursuant to the terms of the agreement between UTCO and Sunrise Financial, Martin was to receive one third of the profits from the transaction as his reward for bringing the transaction to Sunrise Financial and UTCO. In an affidavit, Martineau stated that pursuant to a verbal agreement, UTCO and Sunrise Financial each had an ownership interest in the 35,000 shares, subject to payment to UTCO of the funds it advanced.

In late January 1995, Martin submitted a written memorandum to Martineau, dated January 27, 1995, discussing an offer or proposal made by Worthen that Martineau and Kent take an ownership interest in Bryson's Vu–Data stock. In the memorandum, Martin outlines a scenario pursuant to which Martineau and Kent could profit financially by doing so. Under the scenario, UTCO would provide $250,000 to purchase Bryson's shares—some of which were freely tradeable and some of which were restricted. Bryson's freely tradeable shares would then be placed in an escrow account under Sunrise Financial's control, together with the freely tradable shares owned by Worthen (including the 85,000 discussed above).

For every share then sold, Worthen's and UTCO's holding would each be reduced by 50%. UTCO would receive 75% of the sale proceeds and Worthen would receive 25% until UTCO has recouped the $350,000 it would have advanced at that point, plus interest. Then proceeds would be split evenly between the two. Martin then outlines the following two steps:

> (e) Have Bryson use $75,000 to $100,000 of the $250,000 to go in to market and clean up all trading [accounts] in order to get the stock to the $5 to $6 range. (f) Any "grease" required for retail support will be 1/3 from [UTCO] and 2/3 from [Worthen].

"Grease" is a payment or commission made to a broker in order to induce that broker either to sell a particular stock to that broker's clients or to make a market for a particular stock and typically takes the form of stock or cash. Grease is paid in furtherance of a form of small stock manipulation known as "pump and dump." In those cases, stock promoters gain control of most of the shares of a marginal or struggling business, perhaps resuscitating the company from bankruptcy or linking it to another company with more established business operations, and then begin to trade in the company's stock. Starting at a low price, a very small amount of trading can push prices up. The same 1,000–share block may, for example, move in a circle among a number of buyers in on the scheme, trading slightly higher each time and creating the impression that the share price is rising. When prices rise to a suitable level, the insiders dump their shares, leaving the company's legitimate investors holding virtually worthless stock.

A second memorandum from Martin to Martineau, also dated January 27, 1995, accounts for the 1,000,000 shares of freely-tradeable Vu–Data stock then outstanding by dividing the shares into four categories: shares controlled by Worthen or Bryson that could be immediately delivered to the escrow account, shares controlled by Worthen or Bryson that could be delivered once "wrinkles" were ironed out, shares that were not deliverable, and shares that were "accountable not deliverable."

Martin, who was actively soliciting broker dealers to become Vu–Data market makers at the time he wrote the memoranda, testified that he never paid or proposed paying grease to broker dealers to facilitate their interest in Vu–Data stock. He testified that, having first heard the term from Worthen, he was using "grease" to refer to payments made to a broker in the form of a discount on the price of stock that broker bought or sold on behalf of the party providing the grease.

He explained that "it was a well known fact" that Worthen and Bryson had sold short "a very lot of shares in the market," depressing the price. He testified that he believed that "it was only fair" that they use some of the sale proceeds Bryson was to receive to purchase shares in the market to counteract the negative effect of their earlier action, that is, to push the price of Vu–Data stock back up to the range where it had been

trading before they sold shares short. Martin testified that grease would be necessary to consummate such retail trades.

Martineau testified in his deposition that he did not know the meaning of either "grease" or "retail support." While he acknowledged that he understood that he would control roughly 70% of Vu–Data's registered stock under the outlined scenario, he emphasized that the scenario was only a proposal and was never implemented. Martineau testified that the actual agreement the parties reached is reflected in the documents they executed. Martin testified that Martineau "went forward with the deal."

The deal between Sunrise Financial, UTCO, Martin, and Worthen is embodied in three, simultaneously-executed agreements. The first agreement, dated February 1, 1995,[1] is between Sunrise Financial and Bryson. Pursuant to that agreement, Sunrise Financial acquired Bryson's 825,000 shares— 362,500 of which were allegedly free trading.[2] The purchase price of $400,000 was to be paid to Bryson by Sunrise Financial in five installments.

UTCO advanced the money for the payments. Martineau testified that he believed that there was a corresponding agreement at that time between UTCO and Sunrise Financial. In an affidavit, Martineau explained that "[p]ursuant to a verbal agreement, UTCO and Sunrise each had an ownership interest in Vu–Data shares acquired from Bryson subject to payment to UTCO of all funds advanced in the transaction."

The second agreement, dated February 6, 1995, is between Sunrise Financial, Worthen, and Martin. Under the terms of that agreement, the three agreed to acquire jointly the Bryson stock. Worthen assumed responsibility for certain of the installment payments that Sunrise Financial was required to make to Bryson, totaling $200,000. Once all the payments to Bryson were made, Worthen

was to own 50,000 of the free trading shares acquired from Bryson.

The agreement recites that Martin owns a 33 and 1/3% interest in Worthen's stock. Worthen's 825,000 shares—362,500 of which, like Bryson's, were allegedly free trading— were placed in escrow under Sunrise Financial's control. Sunrise Financial was authorized to accept instructions concerning Worthen's stock from Martin.

Worthen surrendered to Sunrise Financial the 85,000 shares held as collateral for the $100,000 loan Sunrise Financial had previously made to Worthen in satisfaction of that debt. Finally, Worthen was entitled to sell enough of his shares to yield $60,000. After that, any sale would reduce Worthen's and Sunrise Financial's holding by 50%, and each would receive 50% of the proceeds.

When Martineau was asked why Worthen's shares were to be escrowed with those acquired from Bryson, Martineau explained that the arrangement was to prevent Worthen "from selling shares in the open market without our knowledge" in order to ensure that UTCO was repaid first and that the profits were distributed in accordance with their agreements. He stated, "In other words, everybody trusted Sunrise and/or Lee Martineau to take care of that accounting to properly disburse the funds, but they didn't trust any of the other parties. It's that simple."

The third agreement, also dated February 6, 1995, is between Sunrise Financial, UTCO, and Martin. That agreement is entitled "Loan and Profits Distribution Agreement" and references the other two agreements. Among other things, the agreement provides that UTCO will loan to Sunrise Financial the funds required to pay Bryson and "such other sums as may be required from time to time for the benefit of the parties to this Vu– Data investment;" that any profits Sunrise Financial makes shall be divided equally

---

1. This agreement was superseded by a second agreement between Sunrise Financial and Bryson dated February 6, 1995, which purported to clarify the terms of the earlier agreement.

2. Whether the various blocks of Vu–Data stock at issue in this suit were trading lawfully is a disputed matter, which is not addressed in this

decision inasmuch as the motions before the Court are resolved on the other grounds set forth herein. Whether Plaintiffs illegally obtained or utilized inside information concerning Vu–Data is a similarly disputed matter that is likewise not addressed.

among Sunrise, UTCO, and Martin; and that "Martin agrees to use best efforts to assist in the on-going marketing and market-making of shares of Vu–Data stock now held by any of the parties to this agreement as described above, or such other Vu–Data stock as Sunrise may direct."

Between the time these agreements were executed and the time PaineWebber became involved, Martin entered the market to buy and sell small blocks of Vu–Data stock on various occasions. He received reimbursement for his expenses by UTCO and turned sale proceeds over to UTCO, with Martineau serving as an intermediary.

Around the end of August 1995, UTCO and Sunrise Financial acquired an additional 900,-000 restricted Vu–Data shares from Faithful Investments and Holdings, Ltd. for the purchase price of $100,000. In his affidavit, Martineau explained that UTCO and Sunrise Financial were joint owners of those shares, subject again to payment to UTCO of all funds it advanced in the acquisition. Martineau negotiated a deal with Vu–Data pursuant to which, among other things, Vu–Data canceled 150,000 of those shares and instructed its transfer agent to remove the restrictive legend from the remaining 750,-000.

Relative to third parties, UTCO, Sunrise Financial, Worthen, and Martin acted as partners in their Vu–Data dealings, referring to themselves as the "Sunrise Group." Martineau testified that he functioned as a liaison between Kent, on the one hand, and Worthen and Martin, on the other, reviewing their proposals and activities and discussing them with Kent and obtaining Kent's approval when necessary.

*Phase 2: The PaineWebber Transaction.*

At some point near the end of September 1995, Kent determined to sell the group's Vu–Data position. Why Kent determined to do so is a matter of dispute. However, it is undisputed that by September 27th, Plaintiffs had learned from Vu–Data's chief financial officer that Vu–Data was in a critical cash shortage and on the verge of bankruptcy. Martineau instructed Worthen to find a buyer and gave him authority to negotiate with third parties for the sale of 2,000,000 shares—Sunrise Financial, UTCO, Martin, and Worthen each contributed 500,000 shares for this purpose.[3] Attorney Alvin Green represented the Sunrise Group in the proposed sale.

At the beginning of October, Green informed Martineau that Defendant Bistrian had agreed to purchase the shares for $2 million. Bistrian acted on behalf of a group of prospective buyers named as defendants in this suit (collectively, the "Buyer Defendants").[4]

The Buyer Defendants either had or opened accounts at PaineWebber in Palm Beach that were to be used in connection with the purchase. On October 11th or 12th, Joseph Steencken, a PaineWebber broker who had been on the job less than two weeks, told PaineWebber's office manager, Lorraine Malanga, that the Buyer Defendants were going to be the sellers of two million Vu–Data shares in a transaction. He did not tell her that Plaintiffs expected the Buyer Defendants to first buy the securities from the Sunrise Group.

Thereafter, Green wrote a letter to Steencken, dated October 10th, in which Green stated that he would be delivering two million Vu–Data shares to PaineWebber in street form, to be delivered to "your respec-

---

**3.** Martin assigned his ownership interest in these shares to Sunrise Financial and UTCO for the purpose of pursuing this lawsuit. According to Martineau, Worthen pledged his ownership interest in these shares as collateral on obligations owing to Sunrise Financial and UTCO and subsequently failed to meet his repayment obligations, resulting in the forfeiture of his ownership interest to Sunrise Financial and UTCO. However, Plaintiffs produced an agreement between Martin, Worthen, Sunrise Financial, and UTCO pursuant to which Worthen is to receive 33.3% of

any proceeds Plaintiffs realize from this action. Defendants assert that Sunrise Financial and UTCO are alone named as plaintiffs because Martin and Worthen have served time in prison for federal securities fraud.

**4.** The Buyer Defendants are Peter Bistrian, Pasquale Basile, CKN Holding, Inc., Intercontinental Assets Corp., and Specialty Financing International, Inc.

tive buyers" on the following conditions: (1) PaineWebber will deliver a PaineWebber check to Green for $2 million dollars, (2) the transaction will be complete within 48 hours after delivery of the shares to PaineWebber, and (3) the shares will be returned to Green forthwith if the transaction is not complete within 48 hours. Green did not identify Plaintiffs as his principals; rather, he stated that he represented "San Pedro Securities, Ltd." [5]

On Friday, October 13th, Malanga reviewed the letter. Malanga testified that she called Green on that same day and asked him to clarify his instructions. Green told her that Steencken had faxed him a letter guaranteeing the availability of $2 million in the accounts of the Buyer Defendants to complete the transaction. Malanga testified that she told Green that Steencken had no authority to write such a letter and asked him to fax her a copy, which Green refused to do and did not do.

At the time, Steencken told Malanga that he had not given Green such a letter. He later testified that he told Green that PaineWebber had not received the money, but did fax a letter to Green on PaineWebber letterhead guaranteeing that PaineWebber had the $2 million.[6] Steencken testified that the letter was drafted over the phone by either Green, Bistrian, or both of them, and that he used the commercial fax and express mail service across the street from his apartment to deliver it.

According to PaineWebber, Steencken knew Bistrian from New York before he was hired by PaineWebber. Steencken testified that when he told Green the money was not at PaineWebber, Green replied that he did not care, that he knew and trusted Bistrian, that the letter regarding PaineWebber's holding the $2 million was only a formality, and that he was going to deliver the stock anyway.

On October 15th, following Green's conversation with Malanga, Martineau and Martin instructed National Stock Transfer, the Vu–

Data transfer agent, to issue four certificates, representing 1.55 million Vu–Data shares, in the names of certain of the Buyer Defendants. At that time, Martin and Martineau entered into a written agreement with the transfer agent pursuant to which he would cancel the new certificates and return their original certificates if the new certificates were not paid for. At their instruction, the shares were delivered to PaineWebber's Palm Beach office by air courier.

On Monday, October 16th, Steencken picked up the certificates at the airport. The remaining shares were transferred electronically to PaineWebber from Sunrise Financial's brokerage account in Salt Lake City. Steencken gave them to Malanga, telling her that they were the Vu–Data shares he had told her about the week before. He did not tell her that the seller's representatives had sent them to him rather than the Buyer Defendants, in whose names they were issued, or that he understood that the Buyer Defendants had not yet paid for them, if he understood those things. On that same Monday, Malanga telephoned Vu–Data's transfer agent, who told her that the certificates were clean and that there were no stop transfer orders placed on them. PaineWebber's compliance office also telephoned the transfer agent and was also told the certificates were clean.

On October 17th, after performing an investigation, PaineWebber concluded that it would not do business with respect to the shares. After consulting with counsel, Malanga testified that she called Green to give him the opportunity to reclaim them. She told him she would need instructions from the parties involved on where to send them. She testified that Green did not respond to her request and did not claim the shares. Later that same day, Malanga received written instructions from the Buyer Defendants, directing her to ship the shares to a brokerage firm in upstate New York named Caruso

---

5. San Pedro Securities is a company Worthen used to conduct business. PaineWebber did not know this at the time of the events at issue.

6. In the end, Steencken was discharged for having sent the letter without PaineWebber's authority.

McLean,[7] which she did. Malanga assumed the instructions had come from Green because she had not yet informed the Buyer Defendants or anyone else at PaineWebber that she needed the instructions. Malanga testified that before sending the shares out in accordance with the instructions provided by the Buyer Defendants, she again called Green to obtain instructions on where the shares should be sent and that, as before, Green did not respond.

Whether the Buyer Defendants were acting pursuant to directions given by Green when they directed PaineWebber to send the shares to Caruso McLean is a matter of dispute. Robert Brehm, president of two of the Buyer Defendants, testified that Bistrian told him that Green had directed the Buyer Defendants to instruct PaineWebber to ship the stock to Caruso McLean, which had agreed to effect the transaction in Paine-Webber's place.[8]

On October 25th, Martineau contacted PaineWebber and claimed ownership of the shares.

### Phase 3: The Aftermath.

The Buyer Defendants instructed Caruso McLean to return the stock to Plaintiffs shortly thereafter, inasmuch as they no longer wished to complete the transaction. Apparently Caruso McLean did not do so immediately, and, by November 14th, Vu–Data's financial position had deteriorated to the point that it was forced into involuntary bankruptcy.

Records reflect that at the same time Plaintiffs were attempting to sell two million shares of Vu–Data to the Buyer Defendants at $1 per share, they were purchasing small quantities of Vu–Data stock at $5 per share through a securities brokerage firm that acted as a market maker in the stock. For example, Martineau purchased 5,000 shares at that price on October 16th; Martin and Worthen purchased 10,000 shares on October 17th at a little over that price.

Martineau testified that the Sunrise Group was attempting to keep the price of Vu–Data above $5 in order to induce the Buyer Defendants to go through with the transaction. Martineau testified that he had been told by Robert Epstein, who was apparently acting as an intermediary between Green and the Buyer Defendants and would receive a commission if the sale occurred, that the Buyer Defendants would not complete the transaction if the price fell below $5. Martineau testified that he was aware that "there were purchases made after [October 15th or 16th] by Mr. Martin to try to keep the price of the stock at five dollars."

Martineau also admitted to manipulating the market price of Vu–Data in a recorded telephone conversation with a third party, Bill Howe, made sometime after November 1, 1995. Martineau said:

Bill, I agree with you and I have been sitting on my butt for the last 30 days. This thing started on the 15th of October. The 16th is when PaineWebber received all of the shares. We delivered on the 16th. I don't think anybody could fault me with not trying to work a deal. The fact is that we had incurred some huge costs as a result of Bistrian delaying and not coming up with the money and then, these shares that you have being sold into the marketplace when we were told don't let the price drop below five bucks. So we were out there buying shares in an attempt to not allow the price to drop, and hell, we spent more money than you collected, holding the price and that was Bistrian's fault.

### Phase 4: The Lawsuit.

On January 19, 1996, Sunrise Financial and UTCO initiated the present lawsuit, naming PaineWebber, Steencken, and the Buyer Defendants as defendants and asserting claims for securities fraud, conversion,

---

**7.** At Bistrian's instruction, the 450,000 electronically-transferred shares were shipped to Wolverton Securities and Royal Alliance Associates, Inc.

**8.** Plaintiffs have moved to strike that portion of Brehm's affidavit on the grounds that it consti-

tutes double hearsay, that is, Brehm testifying about what Bistrian told him about what Green told Bistrian. Plaintiffs' motion is denied as moot inasmuch as its resolution is unnecessary to the analysis upon which the Court's disposition of the summary judgment motions is based.

breach·of contract (against the Buyer Defendants alone), and breach of fiduciary duty and negligence in the performance of a bailment (against PaineWebber alone). PaineWebber answered and counterclaimed.

In March 1996, the certificates representing 1.55 million shares were returned to Plaintiffs; only a portion of the 450,000 shares wired out of Sunrise Financial's account were returned to Sunrise Financial. Vu–Data is no longer in business.

On July 17, 1997, Plaintiffs moved for partial summary judgment on their conversion claim against PaineWebber and Basile, the only Buyer Defendant to have answered at that time, and on their negligence claim against PaineWebber. PaineWebber crossclaimed for summary judgment arguing that their affirmative defenses of unclean hands and *in pari delicto* bar Plaintiffs' complaint and require its dismissal. Basile joined in PaineWebber's crossmotion. In support of the crossmotion, PaineWebber has put forward evidence indicating that the Sunrise Group acquired the Vu–Data stock for the express purpose of publicly marketing the stock in a market they intended to manipulate.

## II. STANDARD OF REVIEW

A motion for summary judgment under Rule 56 of the *Federal Rules of Civil Procedure* is appropriate when the pleadings, depositions, and affidavits on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The movant bears an initial burden to· demonstrate an absence of evidence to support an essential element of the non-movant's case. If the movant carries this initial burden, the burden then shifts to the non-movant to make a showing sufficient to establish that there is a genuine issue of material fact regarding the existence of that element. "An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant." *Wolf v. Prudential Ins. Co.,* 50 F.3d 793, 796 (10th Cir.1995). In applying the summary judgment standard, the factual record and reasonable· inferences therefrom are to be examined in the light most favorable to the non-movant. *Id.*

## III. DISCUSSION

*Plaintiffs' Motion for Partial Summary Judgment.*

██ Many material fact questions remain with respect to Plaintiffs' claims for conversion and negligence. Such questions include: whether Plaintiffs ever lost control of the shares represented by the certificates in light of Plaintiffs' agreement with the transfer agent, whether PaineWebber acted reasonably and in good faith in delivering out the securities at the instruction of the Buyer Defendants, whether Plaintiffs lulled or mislead PaineWebber into delivering the shares to the Buyer Defendants, whether Steencken's knowledge is attributable to PaineWebber, whether Plaintiffs are the true owners of the shares as opposed to San Pedro Securities, Ltd., whether Plaintiffs were in a debtor-creditor relationship with the Buyer Defendants that precludes Plaintiffs' assertion of a conversion claim against the Buyer Defendants, and whether a bailment contract can be implied from either Green's letter or PaineWebber's behavior.

Accordingly, Plaintiffs' motion for partial summary judgment is denied.

*PaineWebber's Crossmotion for Summary Judgment.*

PaineWebber asserts that Plaintiffs, having manipulated the market price of Vu–Data in violation of § 9(a) of the Securities Exchange Act of 1934, are barred from seeking recovery from PaineWebber under any theory.

Section 9(a)(ii) provides in pertinent part:

It shall be unlawful for any person, directly or indirectly, .... [t]o effect, alone or with one or more persons, a series of transactions in any security registered on a national securities exchange creating actual or apparent active trading in such security or raising or depressing the price of such a security, for the purpose of inducing the purchase or sale of such security by others.

*15 U.S.C. § 78i(a)(ii).* Courts have extended the protection against manipulation § 9 affords national securities exchanges to the over-the-counter markets where Vu–Data's stock was trading through the vehicle of traditional antifraud claims brought under § 10(b) of the Securities Exchange Act. *See, e.g., Securities Exchange Commission v. Resch–Cassin & Co., 362 F.Supp. 964, 975 (S.D.N.Y.1973) ("It is well settled that the manipulative activities expressly prohibited by § 9(a)(2) of the Exchange Act with respect to a listed security are also violations of § 17(a) of the Securities Act and § 10(b) of the Exchange Act when the same activities are conducted with respect to an over-the-counter security.").*

■ Martineau's explicit admission that the Sunrise Group purchased Vu–Data shares for the purpose of preventing the price from failing below $5 per share in order to induce the Buyer Defendants to purchase the two million share block constitutes irrefutable evidence that the Sunrise Group was engaged in securities fraud in violation of § 9(a) of the Securities Exchange Act, as enforced through § 10(b) of the Securities Exchange Act. Even if the other background facts were not as outlined above, the consequences of this admission alone would be fatal.

PaineWebber argues that this conduct bars Plaintiffs' claims under three legal doctrines: the doctrine of unclean hands, the doctrine that one may not profit from his own fraud, and the doctrine of *in pari delicto.* This Court agrees.

■ The unclean hands defense bars a plaintiff's pursuit of a cause of action if the plaintiff is guilty of misconduct in a transaction directly related to that cause of action concerning the opposite party. *See Dale v. Jennings,* 90 Fla. 234, 107 So. 175, 180 (1925). In this case, Plaintiffs committed securities fraud in manipulating the price of Vu–Data to deceive the Buyer Defendants in a transaction involving PaineWebber. The defense is valid for both PaineWebber and Basile on these uncontroverted facts.

■ The defense of *in pari delicto* "is rooted in the common-law notion that a plain-

tiff's recovery may be barred by his own wrongful conduct." *Pinter v. Dahl,* 486 U.S. 622, 632, 108 S.Ct. 2063, 2070, 100 L.Ed.2d 658 (1988); *see also Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 306, 105 S.Ct. 2622, 2626, 86 L.Ed.2d 215 (1985). Assuming that PaineWebber engaged in wrongdoing by delivering the shares to the Buyer Defendants, PaineWebber is also entitled to assert that defense. Assuming that Basile engaged in wrongdoing by directing the transfer of the shares to Caruso McLean, he is also entitled to assert the defense.

In *Bateman,* the Supreme Court established a two-part test for assertion of the defense in a private action for damages under the securities laws. A plaintiff's claim for damages may be barred on the grounds of the plaintiff's own culpability where: "(1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and the protection of the investing public." *Id.* 472 U.S. at 311, 105 S.Ct. at 2629.

The illegal market manipulation by Plaintiffs is far more reprehensible than the wrongdoing with which either PaineWebber or Basile is charged. In that regard, it is important to note that the account set forth by Basile in his affidavit of his limited role in these events has not been controverted by Plaintiffs.

The Court of Appeals for the Second Circuit has applied the *Bateman* test to bar a plaintiff's recovery in circumstances that are strikingly similar to the circumstances here. In *Peltz v. SHB Commodities, Inc.,* 115 F.3d 1082 (2nd Cir.1997), the Second Circuit applied the defense to shield a broker from liability for mistakes the broker made in performing ministerial actions with respect to the account of a client engaged in market manipulation in violation of the Commodities Exchange Act. *Peltz* is highly persuasive here and indicates that the dismissal of the Plaintiffs' complaint against PaineWebber and Basile is appropriate.

Plaintiffs claim against these two defendants is also barred because Plaintiffs are attempting to recover the fruits of their own fraud. Courts do not lend their auspices to such endeavors. *See Ford v. Buffalo Eagle Colliery Co.*, 122 F.2d 555, 563 (4th Cir.1941). Plaintiffs fraudulently manipulated the price of Vu–Data in an attempt to ensure completion of the sale of their Vu–Data stock for $2 million, and attempted to complete the sale of that stock with knowledge of that manipulation. Plaintiffs cannot now seek the Court's assistance to reap the fruits of that transaction from Basile or PaineWebber.

Plaintiffs attempt to avoid this result by shifting the blame for their actions to Epstein, who Plaintiffs assert acted as the Buyer Defendants' agent. The fact that Epstein may have represented the Buyer Defendants is irrelevant in light of Martineau's clear and explicit admission that the Sunrise Group manipulated the market. That they might have done so at the suggestion of Epstein, or anyone else for that matter, is irrelevant.

Plaintiffs also argue that their admissions of market manipulation refer to actions they took after PaineWebber released the shares pursuant to the instructions of the Buyer Defendants. This is contradicted by the record, which shows that Martineau made purchases on October 16th, the day before Malanga released the shares. It is also insufficient as a defense against the application of the legal doctrines at issue because there is no express requirement that Plaintiffs' bad acts occur at any particular time relevant to the acts of the defendants. In fact, *Peltz* specifically held that the lack of identical nature in the wrongs at issue does not destroy the defense. 115 F.3d at 1091.

## IV. CONCLUSION

Plaintiffs' motion for partial summary judgment with respect to their third claim for conversion against Basile and Paine-Webber and their fifth claim for negligence against PaineWebber is denied.[9] Paine-Webber's crossmotion for summary judgment is granted, and accordingly, Plaintiffs'

9. Plaintiffs also moved for summary judgment with respect to their entitlement to $2 million as the measure of their damages. This portion of

complaint against PaineWebber and Basile is HEREBY DISMISSED with prejudice.

their motion is not addressed and is denied as moot inasmuch as Plaintiffs' motion is denied on other grounds.